Page 1

**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

TALMER BANK AND TRUST,                )

                                      )

            Plaintiff,                )

                                      ) Case No. 4:15 CV 1850

vs.                                   ) Judge Benita Y. Pearson

                                      )

GARY KAUSMEYER,                       )

                                      )

            Defendant.                )


- - - - -

THE VIDEOTAPED DEPOSITION OF

GARY KAUSMEYER

WEDNESDAY, JANUARY 20, 2016

- - - - -


        The videotaped deposition of GARY KAUSMEYER,
called by the Plaintiff for examination pursuant
to the Federal Rules of Civil Procedure, taken
before me, the undersigned, Elaine S. Newlin,
Notary Public within and for the State of Ohio,
taken at the offices of Thompson Hine, LLP,
3900 Key Center, 127 Public Square, Cleveland,
Ohio, commencing at 9:35 a.m., the day and date
above set forth.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 2

```
 1   APPEARANCES:
 2     On behalf of the Plaintiff:
 3             Robert F. Ware, Esq.
               Thompson Hine, LLP
 4             3900 Key Center
               127 Public Square
 5             Cleveland, Ohio  44114
               216-566-5500
 6             Rob.Ware@ThompsonHine.com
 7
       On behalf of the Defendant:
 8
               Ellen M. Kramer, Esq.
 9             Cohen Rosenthal & Kramer, LLP
               The Hoyt Block Building, Suite 400
10             700 West St. Clair Avenue
               Cleveland, Ohio  44113
11             216-781-7956
               emk@crklaw.com
12
13   ALSO PRESENT:
14             David J. Wolfe, Jr.
               Alex Cook, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

```
 1          GARY KAUSMEYER DEPOSITION INDEX
 2      Examinations                              Page
 3      BY MR. WARE.................................5
 4
 5                E X H I B I T S
 6      No.                                        Page
 7      Plaintiff's Exhibit No. 1................... 13
        Plaintiff's Exhibit No. 2................... 35
 8      Plaintiff's Exhibit No. 3................... 42
        Plaintiff's Exhibit No. 4................... 50
 9      Plaintiff's Exhibit No. 5................... 53
        Plaintiff's Exhibit No. 6................... 57
10      Plaintiff's Exhibits Nos. 7A, 7B, 7C
            and 7D................................. 65
11      Plaintiff's Exhibit No. 8................... 67
        Plaintiff's Exhibits Nos. 9A, 9B and 9C..... 70
12      Plaintiff's Exhibit No. 10................. 71
        Plaintiff's Exhibit No. 11................. 72
13      Plaintiff's Exhibits Nos. 12A through 12K... 77
        Plaintiff's Exhibit No. 13................. 85
14      Plaintiff's Exhibit No. 14................. 89
        Plaintiff's Exhibit No. 15................. 90
15      Plaintiff's Exhibit No. 16................. 92
        Plaintiff's Exhibit No. 17................. 94
16      Plaintiff's Exhibits Nos. 18 and 19......... 101
        Plaintiff's Exhibit No. 20................. 120
17      Plaintiff's Exhibit No. 21................. 125
        Plaintiff's Exhibit No. 22................. 128
18      Plaintiff's Exhibits Nos. 23 and 24......... 133
        Plaintiff's Exhibit No. 25................. 137
19      Plaintiff's Exhibit No. 26................. 137
        Plaintiff's Exhibit No. 27................. 141
20      Plaintiff's Exhibits Nos. 28A through 28N... 143
        Plaintiff's Exhibits Nos. 29A through 29D... 147
21      Plaintiff's Exhibits Nos. 30A and 30B....... 149
        Plaintiff's Exhibit No. 31................. 150
22      Plaintiff's Exhibits Nos. 32A through 32D... 151
        Plaintiff's Exhibit No. 33................. 152
23      Plaintiff's Exhibit No. 34................. 153
        Plaintiff's Exhibit No. 35................. 154
24      Plaintiff's Exhibit No. 36................. 155
        Plaintiff's Exhibit No. 37................. 157
25      Plaintiff's Exhibit No. 38................. 162
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 4

1              THE VIDEOGRAPHER:   We're on the
2      record.  The time is 9:35.  Today's date is
3      January 20th, 2016.
4          We're here for the video recorded
5      deposition of Gary Kausmeyer in the case Talmer
6      Bank and Trust versus Gary Kausmeyer, Case
7      Number 4:15 CV 01850 in the United States
8      District Court for the Northern District of
9      Ohio.
10         Will the attorneys present please
11     identify themselves for the record?
12              MR. WARE:        Robert Ware
13     for plaintiff, Talmer Bank and Trust.
14              MS. KRAMER:        Ellen Kramer
15     for defendant, Gary Kausmeyer.
16              THE VIDEOGRAPHER:   Will the
17     court reporter please swear in the witness?
18              THE REPORTER:        Would you
19     raise your right hand, please?
20              GARY KAUSMEYER
21     of lawful age, called by the Plaintiff for
22     examination pursuant to the Federal Rules of
23     Civil Procedure, having been first duly sworn,
24     as hereinafter certified, was examined and
25     testified as follows:

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 5

```
 1              EXAMINATION OF GARY KAUSMEYER

 2   BY MR. WARE:

 3   Q   Good morning, Mr. Kausmeyer.

 4   A   Good morning.

 5   Q   We met off the record.  My name is Rob Ware.  I

 6       represent the plaintiff, Talmer, in this case,

 7       and you are the defendant in the case against

 8       Talmer Bank and Trust, correct?

 9   A   That is correct.

10   Q   And you are a former employee of First Place

11       Bank which is a predecessor of Talmer?

12   A   That is correct.

13   Q   And could you state your address, your current

14       home address, please?

15   A   It's 9365 Southwest 61st Way, apartment D as in

16       David, in Boca Raton, Florida, 33428.

17   Q   And where do you work currently?

18   A   In California.

19   Q   And for what company?

20   A   Bank of California.

21   Q   All right.  And how long have you had that

22       position?

23   A   Just a few weeks.

24   Q   And where did you work prior to that?

25   A   Los Alamos National Bank in New Mexico, and
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 6

```
 1      prior to that, First Place Bank.
 2  Q   When did you start at Los Alamos National Bank?
 3  A   It was about ten months after First Place Bank,
 4      in September of 2014.
 5  Q   So you started in around September of 2014?
 6  A   Correct.
 7  Q   And then you joined Bank of California just a
 8      few weeks ago?
 9  A   Correct.
10  Q   So that would have been approximately the
11      beginning of the year in 2016?
12  A   No.  It would have been late November.
13      November 30th was my first day of employment.
14  Q   Late November of 2015?
15  A   Yes.
16  Q   And what is your position with Bank of
17      California?
18  A   Deputy chief risk officer.
19  Q   And what was your position with the Los Alamos
20      National Bank?
21  A   Chief risk officer.
22  Q   Have you ever had your deposition taken before?
23  A   No.
24  Q   You understand that everything you indicate
25      while we're on the record, everything you state
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 7

1      will be taken down by the court reporter?

2    A   Understood.

3    Q   And you also understand that we are videotaping

4        this deposition, and so, again, while we're on

5        the record, you will be videotaped?

6    A   Understood.

7    Q   Did you do anything to prepare for today's

8        deposition?

9    A   Reviewed some of the communications that have

10       been made public through this filing.

11       Certainly your stack of papers.  It's a lot

12       more than I would have reviewed, but just a few

13       documents to help refresh my memory on a lot of

14       the events we'll discuss today.

15   Q   Do you recall any documents in particular that

16       you reviewed?

17   A   The public filings and the counterclaim.

18   Q   When you say "public filings," you're talking

19       about the pleadings in the case --

20   A   Correct.

21   Q   -- like the Complaint, that kind of thing?

22   A   Yes.

23   Q   Did you review any e-mails?

24   A   Just I believe one long e-mail string between

25       Sandy and I leading up to the November 2013

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 8

1      meeting at First Place at its headquarters in

2      Warren, Ohio.

3   Q   And that was an e-mail string that you produced

4      to us in this case; is that right?

5   A   Correct.  Correct.

6   Q   Any other documents you recall reviewing other

7      than the pleadings and that e-mail string?

8   A   The offer letter was also included as well as

9      the Change in Control.

10   Q   You're talking about the Change in Control

11      Agreement?

12   A   Correct.

13   Q   Anything else that you recall?

14   A   And the executed Project Completion Agreement.

15      I believe that was the extent of my preparation

16      for today.

17   Q   And did you meet with counsel?

18   A   Yes.

19   Q   And that was Ms. Kramer?

20   A   Yes.

21   Q   Did you speak with anyone other than counsel

22      about your deposition today?

23   A   No.

24   Q   All right.  You graduated from the University

25      of Miami in Florida; is that right?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 9

1   A   That's correct.

2   Q   And when was that?

3   A   May of 2003.

4   Q   And you had a bachelor's degree in accounting

5       and legal studies; is that right?

6   A   Correct.

7   Q   You are a CPA?

8   A   Post-employment at First Place, I did go back

9       to graduate school, received a master's in

10      accounting and become a licensed CPA.

11  Q   And when did you get your CPA license?

12  A   December of 2014.

13  Q   So in that ten months between the time you left

14      First Place Bank and started at Los Alamos, you

15      went back for a master's in accounting?

16  A   Went back for a master's in accounting

17      concurrently with seeking employment

18      opportunities.

19  Q   And where did you get that master's in

20      accounting?

21  A   Belmont University.

22  Q   And I take it you took the CPA exam in that

23      time period as well?

24  A   I took the CPA prior to my employment at First

25      Place Bank and the last part during my

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 10

1        employment at First Place Bank.

2    Q   Okay.  So that you passed the CPA exam while

3        you were employed at First Place Bank?

4    A   That is correct.

5    Q   And what else did you have to do to become a

6        licensed CPA after you left First Place Bank?

7    A   Attain 150 credit hours, and then there were

8        certain educational requirements for upper

9        division accounting that the State of Florida

10       required in order to become licensed.

11   Q   And did you satisfy the 150 hours and the other

12       requirements by taking the course work at

13       Belmont University?

14   A   That is correct.

15   Q   You are also a certified anti-money laundering

16       specialist; is that right?

17   A   That is correct.

18   Q   And a certified information systems auditor?

19   A   That's correct.

20   Q   You're certified in risk and information

21       systems controls?

22   A   That is correct.

23   Q   You're a certified Sarbanes-Oxley expert?

24   A   That is correct.

25   Q   You are a certified regulatory compliance

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 11

1      manager?

2   A   That is not correct.

3   Q   Have you sought that certification?

4   A   I have completed the prerequisites for the exam

5       and have not sat for the exam.

6   Q   Other than the certifications that we've

7       mentioned, do you hold any other types of

8       certifications or specialist designations?

9   A   No.

10  Q   Before working at First Place Bank, you worked

11      at Grant Thornton; is that right?

12  A   That is -- well, not immediately prior to, but

13      yes, in my employment history.

14  Q   And at Grant Thornton, you were an auditor and

15      accountant; is that right?

16  A   That's correct.

17  Q   You also worked prior to First Place Bank at

18      Bank Atlantic; is that right?

19  A   That's correct.

20  Q   And you were a vice president there?

21  A   That was my ending title, correct.

22  Q   And you worked in risk management there; is

23      that right?

24  A   For approximately four years.

25  Q   And you joined First Place Bank in June of

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 12

```
 1       2011; is that right?
 2   A   That's correct.
 3   Q   And what was your title when you joined First
 4       Place Bank?
 5   A   Chief risk officer, and at the time of joining,
 6       they said the corporate executive vice
 7       president title was subject to board approval.
 8   Q   And did that approval ultimately come?  Did
 9       that become your title?
10   A   I was not told otherwise, so I can't say when
11       the board would have approved it, but I was
12       told not -- to not use the title, if that makes
13       any sense.  So --
14   Q   I understand.
15   A   -- as far as I am aware, that was the title
16       that was approved at some point.
17   Q   Your understanding is that your title at First
18       Place Bank was executive vice president and
19       chief risk officer?
20   A   Correct.
21   Q   And did your title ever change during the time
22       you were employed at First Place Bank?
23   A   No.
24   Q   All right.  Let's take a look at the exhibit
25       we've marked as number 1 for today's deposition.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 13

```
 1                    - - - - -
 2         (Plaintiff's Exhibit No. 1 was marked.)
 3                    - - - - -
 4   Q   And do you recognize this as the offer letter
 5       that you received from First Place Bank on or
 6       about May 17, 2011?
 7   A   I do.
 8   Q   And this is a document -- if you look on the
 9       bottom right-hand corner of this document, you
10       see it indicates KAUSMEYER001.  Do you see
11       that?
12   A   I do.
13   Q   And do you understand that that's an indication
14       that this is a document that was in your files
15       and produced to us in connection with this
16       litigation?
17   A   I do now, yes.
18   Q   Okay.  So this is a document that you had
19       retained from your time at First Place Bank?
20   A   Correct.
21   Q   And I take it you had this in a hard copy file?
22   A   I -- yes.  I produced a signature to the bank.
23       Whether they kept the original and I had a copy
24       or I had the original and they have the copy of
25       that, I'm not 100 percent sure.  I would have
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 14

1     had to sign this in order to start.

2  Q  Correct.  Okay.  I understand.  We're looking

3     at an unsigned version, correct?

4  A  Yes.

5  Q  But this is a document -- what I was just

6     trying to get to is, this a document you kept

7     in a hard copy file in your home office I take

8     it?

9  A  Well, it came to me electronically.  I would

10    have had it electronically.  And upon starting

11    with the bank, either they produced a hard copy

12    or I would have printed and signed this when I

13    started.  I don't exactly remember who produced

14    a hard copy.

15  Q  Okay.  How do you keep it today?

16  A  This was sent to my e-mail and it would still

17    be in my e-mail.

18  Q  So this is a document that you would have

19    received by e-mail and you still maintain it in

20    your e-mail today?

21  A  I believe so, yes.

22  Q  And there's an e-mail at the top that's

23    gkausmeyer@gmail.com.  Do you see that?

24  A  Yep.

25  Q  Is that still an e-mail that you use today?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 15

1    A    Still an e-mail I use today.

2    Q    All right.  The offer letter indicates that

3         your annual salary will be $135,000.  Was that,

4         in fact, the salary that you started at at

5         First Place Bank?

6    A    That is correct.

7    Q    Did that salary change during the course of

8         your employment there?

9    A    Yes, it did.

10   Q    And do you recall how it changed?

11   A    The board of directors, recognizing the work

12        that I had performed, increased it by $25,000

13        to $160,000.

14   Q    And when did that increase take place?

15   A    That would have been early 2012.

16   Q    And were there any other adjustments to your

17        salary, your base salary, that you recall?

18   A    That's the only one I recall.

19   Q    And did you receive any kind of bonus at the

20        end of 2011?

21   A    No.

22   Q    Did you receive any kind of bonus at the end of

23        2012?

24   A    No.

25   Q    This offer letter also talks about housing and

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 16

1          a relocation policy in the third paragraph.  Do

2          you see that?

3     A    Yes.

4     Q    And it indicates that you would be entitled to

5          receive "up to $1,500 for reimbursement of

6          temporary housing, travel to and from Florida,

7          et cetera, up to a total of $9,000 of allowable

8          expenses incurred during the first six months."

9          Do you see that?

10    A    I do.

11    Q    And then below that it also indicates that

12         you're entitled to "receive up to" 20,000 "for

13         reimbursement of reasonable and customary move-

14         related expenses and/or housing related costs

15         within two years of your start date."  Do you

16         see that?

17    A    I do.

18    Q    Did you submit expenses in regard to this

19         particular paragraph?

20    A    Yes.

21    Q    And just below what I was reading it indicates,

22         "First Place will use the 'direct payment'

23         method as much as possible for reimbursements."

24         Do you see that?

25    A    I do.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 17

```
 1  Q   And that's indicating that First Place would
 2      actually make the payment to whoever the vendor
 3      was related to your relocation rather than
 4      having you submit it for reimbursement?
 5  A   I don't -- that is what it says here.  In the
 6      conversations with our human resources
 7      department, I was told to submit receipts to
 8      them.
 9          The bank did not pay the vendors
10      directly.  I incurred all expenses
11      out-of-pocket, so there wouldn't have been an
12      opportunity for direct payment.  When I drove
13      the U-Haul, I am the vendor, I am making the
14      move, I am driving, so there is no potential
15      for hiring of the third party if I am the one
16      that's completing the move.
17  Q   Do you recall that the bank made direct
18      payments to pay for your rent in Ohio after the
19      time that you started working at First Place
20      Bank?
21  A   They did not make direct payments for my rent
22      in Ohio, no.
23  Q   Do you recall any direct payments that the bank
24      made at your direction?
25  A   The bank made no direct payments on my behalf.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 18

1    Q    Okay.  And you indicated you submitted these

2         expenses.  When did you submit those expenses?

3    A    The initial expenses were submitted numerous

4         times.  The policy as explained by our

5         executive vice president of HR was that it was

6         customary to submit expenses twice a year.  He

7         recommended that I follow his lead in doing

8         that in May and November of each year.

9             And the first opportunity to submit would

10        have been November of 2011 at which time the

11        CEO that needed to approve was under

12        investigation.  I was assisting in that

13        investigation and did not approach the CEO at

14        that time based on advice received in

15        connection with the investigation.

16            In May of the following year, the CEO was

17        removed a month earlier by the board.  When a

18        new CEO was hired, I had let them know that I

19        have, you know, about a year's worth of

20        expenses at that point.  The new individual

21        said he would be happy to review that once he

22        received non-objection from the office of the

23        comptroller of the currency, and that non-

24        objection never was approved.  He was denied

25        his role as CEO of First Place Bank.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 19

1          So there wasn't another opportunity until

2     the spring of 2013 when Mr. Shafer assumed the

3     role of chief executive officer of First Place

4     Bank in his dual -- in a dual role as vice

5     chairman of Talmer, and it was at that point,

6     in April of 2013, that I had submitted for

7     reimbursement.  There was a portion that was

8     fully documented with receipts and a portion

9     that was lacking receipts.

10  Q  And in April of 2013, you submitted these

11     expenses directly to Mr. Shafer?

12  A  Mr. Shafer wasn't on site every day, so his

13     assistant would have received the expense forms

14     for his signature.  She would maintain

15     everything until he returned to the office to

16     sign off on.  And I had an assistant help in

17     the preparation of those forms.

18  Q  And how did you -- I take it you gave the forms

19     to an assistant?

20  A  Correct, or the assistant located the forms.

21  Q  So your assistant located the forms?

22  A  I believe so.

23  Q  And who is your assistant?

24  A  Tara Gladd.

25  Q  Can you give me that name again?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 20

```
 1   A   Last name is G-l-a-d-d.  The first name is

 2       Tara.

 3   Q   And so Ms. Gladd attained the forms for you.  I

 4       take it you filled out the forms?

 5   A   Put the -- we worked on it together, put the

 6       forms together, and she segregated expenses

 7       with those that I had receipts handy for and

 8       those that I still needed to locate.

 9   Q   And then how were the -- was the expense --

10       excuse me.  Let me start that over.

11           How was the expense reimbursement form

12       and the receipts that you had submitted to

13       Mr. Shafer's assistant?

14   A   They would have just been hand-delivered hard

15       copy with receipts attached and copies of those

16       were made for my records.

17   Q   Did you hand-deliver them or did Ms. Gladd

18       hand-deliver them?

19   A   Ms. Gladd hand-delivered them.

20   Q   So you gave everything to Ms. Gladd, she

21       collected everything, hand-delivered it to

22       Mr. Shafer's assistant?

23   A   That is correct.

24   Q   And who is Mr. Shafer's assistant?

25   A   Kim Wadman.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 21

1  Q  And who made copies for your files?

2  A  I believe Tara made those copies as well.  And

3     on the after hours -- you know, she had to

4     leave every day at 5:00.  If anything took

5     place after hours, I would make copies after

6     hours.  I didn't ask her to stay or work

7     overtime for this project.

8  Q  And I take it you would have received those

9     copies in April of 2013 then?

10 A  That is correct.

11 Q  And what did you do with the copies of the

12    forms and receipts that you submitted?

13 A  I have maintained them, but they're probably in

14    a moving box right now in California which I

15    have not had an opportunity to locate.

16 Q  So those have not been produced to us?

17 A  Not yet.

18 Q  And did you ever talk with Mr. Shafer directly

19    about the submission of your expenses?

20 A  Yes; February 2013 in my office.  When I

21    informed him that these were outstanding, he

22    recognized that I would have one and only one

23    opportunity to submit everything for his review

24    and approval.

25 Q  So this was a one-on-one conversation, correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 22

1   A   That is correct.

2   Q   There were no e-mails or other kind of written

3       communication between you about this?

4   A   No.

5   Q   After you submitted the expenses through

6       Ms. Gladd and Ms. Wadman, did you have any

7       discussion with Mr. Shafer about them?

8   A   No.  All of the discussion with Mr. Shafer

9       happened prior to submission.  The only thing

10      that Mr. Shafer referenced in terms of the

11      expenses was not approval or denial, but tried

12      to utilize that expense reimbursement as part

13      of the negotiations that First Place was trying

14      to have me enter into with the agreements that

15      were presented at the end of 2013.

16                  MS. KRAMER:        Can we take a

17      quick break?  I want to just touch base with

18      Gary and get a cup of coffee.

19                  MR. WARE:          Sure.

20                  MS. KRAMER:        Thank you.

21                  THE VIDEOGRAPHER:    Off the

22      record.  The time is 9:57.

23                  (Short break taken.)

24                  THE VIDEOGRAPHER:    Back on the

25      record.  The time is 10:02.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 23

1   BY MR. WARE:

2   Q   Okay.  Mr. Kausmeyer, before we took our break,

3       you had just indicated that you had had no

4       discussions with Mr. Shafer after submitting

5       the reimbursement request in April of 2013 and

6       no discussion directly with him.  Is that right?

7   A   That is correct.

8   Q   And the next time you had any discussions

9       relating to that reimbursement request was in

10      connection with negotiations of agreements

11      around the termination of your employment?

12  A   That is correct.

13  Q   Did anyone ever indicate to you at First Place

14      Bank or Talmer that Mr. Shafer had signed off

15      on your reimbursement request?

16  A   No one indicated that.

17  Q   And you never received any document indicating

18      that I take it?

19  A   No.

20  Q   That statement's correct?

21  A   That statement's correct.

22  Q   And I take it you didn't follow up with

23      Mr. Shafer or anyone else until again there

24      were these discussions about around the

25      agreements as part of the termination of your

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 24

1    employment?

2  A  No.

3  Q  Is that correct?

4  A  That's correct.

5  Q  And do you recall the amount of the

6     reimbursement request that you made in April of

7     2013?

8  A  I do not at this time recall.  I do know I was

9     expecting a sizeable reimbursement, but I don't

10    have the exact amount.  When we produce the

11    reports, we'll be able to see what was there.

12  Q  And in April of 2013, did you submit any other

13     request for reimbursement other than what you

14     submitted to Mr. Shafer through his secretary?

15  A  No.

16  Q  So it was only one request for reimbursement?

17  A  With receipts, correct.

18  Q  Was there any other -- and let's just be clear.

19     We're talking about reimbursement for costs

20     associated with your relocation and temporary

21     housing and travel and so forth; is that right?

22  A  That's part of it, yes.

23  Q  Were there other things that were part of it?

24  A  Yes.

25  Q  What other things were part of it?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 25

1   A   Normal business expenses that were incurred.

2   Q   So the request included a request for normal

3       business expenses that you had for things like

4       I take it travel or meals that you incurred on

5       behalf of your work at First Place Bank?

6   A   Correct.

7   Q   And in terms of the actual document that you

8       submitted, was this one document laying out all

9       these expenses, or did you submit separate

10      documents for the work-related expenses versus

11      the relocation expenses?

12  A   I don't recall specifically how.  They were

13      just denoted as expenses with supporting

14      documentation.

15  Q   But you recall it being sort of all together in

16      one collection?

17  A   Voluminous, yes, yes.

18  Q   With respect to the form, do you recall whether

19      there was a separate form for the relocation

20      expenses and housing expenses versus a form

21      that you had for the business expenses, or was

22      it all collected on one form?

23  A   It was all on one form.

24  Q   All on one form.

25  A   I don't believe the bank had separate documents

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 26

1      for any of that.

2  Q   So your recollection as you sit here today is

3      you made one request for reimbursement of

4      expenses that included your relocation, housing

5      and regular business expenses that were all

6      collected and delineated on a single form with

7      receipts attached?

8  A   Correct.

9  Q   And you indicated that you didn't have certain

10     receipts for some of the things.  What were the

11     things you didn't have receipts for?

12 A   Same expenses on a different form.

13 Q   I'm sorry.  Could you explain that?

14 A   So there would have been other expenses in

15     regards to the move or normal business expenses

16     that did not have receipts associated with it

17     and I would have to locate.

18 Q   So were those other expenses things that you

19     listed on your form but just didn't support

20     with receipts, or did you just not submit for

21     those?

22 A   There was two separate forms created; one with

23     receipts, one without.  With receipts

24     submitted; without was the discussion items

25     related to the termination agreements at the

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 27

1      end of the year.

2  Q   Okay.  So now I'm confused.  So you had -- at

3      the time you submitted all of your expenses in

4      April of 2013, you're saying you actually had

5      some you didn't submit?

6  A   Correct.

7  Q   So you submitted -- I thought I heard your

8      testimony was you submitted everything,

9      including the ones that you couldn't support

10     with receipts, in April of 2013.

11  A  With receipts.

12  Q  I'm sorry.  What do you mean by that?

13  A  Only expenses that had receipts were submitted

14     in April of '13.  Those without, I had to

15     locate and would have to submit at a later date.

16  Q  And you don't recall the amount that you

17     submitted in April of 2013, correct?

18  A  Do not recall, no.

19  Q  And do you recall the amount that was

20     outstanding that you didn't have receipts for

21     in April of 2013?

22  A  I do not recall.

23  Q  And have you since -- or at any time since

24     April of 2013, did you locate the receipts for

25     those things that you didn't submit?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 28

```
 1   A   For some expenses, yes.

 2   Q   And when did you locate those?

 3   A   I don't recall.  It would have been --

 4   Q   Is it after -- oh, go ahead.

 5   A   It would have been sometime after.

 6   Q   After your employment at First Place Bank was

 7       terminated?

 8   A   Correct.

 9   Q   So --

10   A   And termination for me would have been July of

11       2013.

12   Q   So it was sometime after July of 2013?

13   A   Correct.

14   Q   Was it after November of 2013?

15   A   In the move the following month, additional

16       documentation I did uncover when I was packing

17       up, so yes, there would have been receipts

18       located at that time as well.

19   Q   The following month meaning December of 2013?

20   A   Correct.

21   Q   All right.  So you located some of those

22       receipts in December of 2013 that you hadn't

23       had in April of 2013?

24   A   Correct.

25   Q   In between April of 2013 and December of 2013,
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 29

1      had you located any of those receipts for

2      expenses that you had not yet submitted to

3      First Place Bank?

4   A   Yes.

5   Q   And what did you do?  Did you make another

6      submission?

7   A   The second form of expenses with no receipts, I

8      was trying to find each of those receipts to

9      submit one document.  I couldn't reproduce.  I

10     didn't have an ability to reproduce, so it was

11     either find the receipts and submit as one or

12     not submit.

13  Q   I'm not sure I understand your response.  Did

14     you submit any requests for reimbursement to

15     First Place Bank after April of 2013?

16  A   No.

17  Q   Did you supplement any requests for

18     reimbursement that you had previously submitted

19     to First Place Bank at any time -- with

20     receipts at any time after April of 2013?

21  A   I'm sorry.  Can you repeat that?

22  Q   Sure.  I just want to be 100 percent clear.

23         You indicated after April of 2013, you

24     never submitted any requests for reimbursement

25     of expenses to First Place Bank.  Is that

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 30

1     right?

2  A  Correct.  Correct.

3  Q  And my question is, did you ever provide

4     receipts that you found after April of 2013 to

5     anyone at First Place Bank.

6  A  No.

7  Q  So whatever you may have found after April of

8     2013, those were never submitted to First Place

9     Bank; is that correct?

10  A  Correct.

11  Q  And you don't recall as you sit here today what

12     the amount of those undocumented expenses was?

13  A  I do not.

14  Q  And do you have any way of coming up with that

15     number as you sit here today?

16  A  I do.

17  Q  What way would that be?

18  A  Locating the forms.

19  Q  So the forms, the copy of the forms would have

20     had the number for the undocumented expenses?

21  A  Correct.

22  Q  And did you ever submit the form for the

23     undocumented expenses to First Place Bank?

24  A  No.

25  Q  So you just kept that in your files?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 31

1    A    Correct.

2    Q    And that's one that you haven't yet produced in

3         this case?  It's still --

4    A    Correct.

5    Q    -- in your boxes; is that right?

6    A    Correct.

7    Q    And you indicated that you moved, but you gave

8         me a home address of Boca Raton.  Did you move

9         in Boca Raton recently?

10   A    No.

11   Q    So what move are we talking about here?

12   A    I have -- directly from Ohio, I had attended

13        school in Nashville, so I moved to Nashville

14        temporarily to complete the degree, and I

15        commuted weekly from New Mexico back and forth

16        across country.

17   Q    From New Mexico to Nashville?

18   A    Correct, and then to Florida.

19   Q    And so in what -- in connection with what,

20        which one of those activities, did you have

21        boxes of things that you had packed up?

22   A    Well, for the first move out of Ohio, that's

23        when everything would have been packed.

24   Q    So we're talking about boxes that you've had

25        somewhere since December of 2013?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 32

1    A    Correct.

2    Q    And do you know where those boxes are?

3    A    I do.

4    Q    Where are they?

5    A    They are currently in California.

6    Q    Okay.  And where are they in California?

7    A    In the garage -- in a garage in storage.

8    Q    And why did you move them to California?  You

9         had just indicated you were going from --

10   A    I will be relocating next month permanently to

11        California.

12   Q    So you have sent them to California in

13        anticipation of relocating?

14   A    Correct.

15   Q    And when will this move occur?

16   A    President's Day weekend.

17   Q    You had indicated a little while ago that the

18        senior vice president of human resources had

19        told you that expenses were to be submitted two

20        times per year.  Who was that person?

21   A    That would have been the executive vice

22        president, Rob Kowalski.

23   Q    And was there some policy at First Place Bank

24        to only submit expenses twice a year?

25   A    Mr. Kowalski represented there was no formal

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 33

1       policy in place.

2    Q   And was this with respect to just the

3        relocation and temporary housing expenses that

4        are mentioned in Exhibit Number 1, or was this

5        generally with all business expenses?

6    A   Mr. Kowalski did not delineate between the two.

7    Q   And did you ever check with anyone else about

8        this idea that you're only supposed to submit

9        expenses two times a year?

10   A   No.

11   Q   And I take it you never saw any written policy

12       or any written directive that indicated you

13       should only submit expenses two times a year?

14   A   No.

15   Q   And you had also indicated that you were unable

16       to submit your expenses because the first CEO

17       was under investigation, the next CEO had not

18       received a non-objection letter from the OCC.

19       Why is it that you felt that you had to submit

20       expenses directly to the CEO?

21   A   That was communicated by HR, that CEO needed

22       approval of expenses prior to reimbursement.

23   Q   And so my question is why did you need to

24       actually submit them to the CEO.  Couldn't you

25       submit them through HR?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 34

1   A   HR's direction was to submit to the CEO.

2   Q   And who in HR told you you had to submit them

3       directly to the CEO?

4   A   Rob Kowalski.

5   Q   And did you ever seek to submit them to

6       Mr. Lewis, or did you just decide for yourself,

7       because he was under investigation, I'm not

8       going to submit them?

9   A   Mr. Lewis was never approached in regard to my

10      expenses.

11  Q   So you decided for yourself not to submit them?

12  A   That's correct.

13  Q   And same question with respect to the next

14      person that temporarily occupied that position,

15      and I didn't get his name.

16  A   Hugh Dunham.

17  Q   Mr. Dunham.  Did you seek to submit?  Did you

18      ask him --

19  A   Yes.

20  Q   -- "Can I submit?"

21  A   Yes.  And he replied that after receiving

22      non-objection, he'd be happy to.

23  Q   And in all of this time up till April 2013, did

24      you submit any requests for reimbursement of

25      expenses at First Place Bank?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 35

 1  A  Nothing more in addition than we've already

 2     discussed.

 3  Q  And I don't think we've discussed any other

 4     than April of 2013.

 5  A  The submission to Mr. Dunham was my first

 6     approach with the new CEO, and then the second

 7     approach was with Mr. Shafer in February of '13.

 8  Q  But you didn't actually give Mr. Dunham any

 9     requests for reimbursement, correct?  You only

10     had a discussion with him?

11  A  Correct.

12  Q  About the possibility of giving it to him?

13  A  Correct.

14  Q  So the question is did you actually make any

15     request for reimbursement, submit forms or

16     receipts, ask for reimbursement to anyone at

17     First Place Bank before you made your submission

18     in April of 2013.

19  A  No.

20                   - - - - -

21            (Plaintiff's Exhibit No. 2 was marked.)

22                   - - - - -

23  Q  All right.  I'm going to show you what's been

24     marked as Exhibit 2 for purposes of your

25     deposition, and do you recognize this document?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 36

1    A    I do.

2    Q    This is the Responses to Plaintiff's First Set

3         of Interrogatories and Requests for Admissions

4         that we received from your counsel.  I take it

5         you would have reviewed these responses and

6         provided the information for them.  Is that

7         right?

8    A    Correct.

9    Q    And in response to interrogatory 2, it's on

10        page 2, at the end of that response you

11        indicate that you "incurred temporary housing

12        expenses of at least $5,700 ($950 per month for

13        6 months)."  Do you see that?

14   A    Yes.

15   Q    And who did you incur those housing expenses

16        to?  Who did you pay them to?

17   A    The apartment complex where I resided.

18   Q    And what was the name of that complex?

19   A    Sawgrass Apartments.

20   Q    And how did you pay Sawgrass Apartments?

21   A    Personal check.

22   Q    So you would have personal checks or copies of

23        personal checks that your bank would have from

24        this time period for each of those payments; is

25        that right?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 37

1   A   I do not know the answer to that.

2   Q   Do you know whether the $5,700 referenced here

3       was part of your submission in April of 2013?

4   A   Yes.

5   Q   Yes, you do know that it was?

6   A   Yes.

7   Q   So these are things that you did at that time

8       at least have documentation of?

9   A   Correct.

10  Q   And it's your belief that you have the

11      documentation in your possession even today?

12  A   Correct.

13  Q   That they're in boxes that you haven't been

14      able to obtain?

15  A   Correct.

16  Q   Now, you produced to us, and we're going to

17      talk about these later in detail, but you

18      produced to us documents relating to various

19      expenses that you had mostly in 2011 and 2012.

20      Were the documents you produced to us documents

21      that reflect expenses that you had requested

22      reimbursement for from First Place Bank?

23  A   I would need to see which documents you're

24      referencing.

25  Q   Okay.  We'll do that in a little while.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 38

1          Did you have responsibility for

2     compliance at First Place Bank?

3  A   I did.

4  Q   And what did you have to do with respect to

5     compliance?

6  A   I oversaw and managed the function.

7  Q   And so would that have included the bank's

8     compliance with the orders from the OCC?

9  A   Upon initial employment, no, but I did inherit

10    the responsibility.

11 Q   And when did you inherit that responsibility?

12 A   I don't recall the exact date, but it had to be

13    sometime between June of 2011 and June of 2012.

14 Q   And who did you inherit that responsibility

15    from?

16 A   CEO Steve Lewis.

17 Q   So after Mr. Lewis left the bank, that became

18    your responsibility?

19 A   I don't know if it occurred prior to or post

20    departure.  I don't recall.

21 Q   And what did you have to do?  I mean what were

22    your principal responsibilities in terms of the

23    bank's compliance with orders from OCC?

24 A   To oversee corrective actions and to document

25    those corrective actions.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 39

1  Q  Did you communicate with the OCC in this

2     regard?

3  A  Yes.

4  Q  And how would you have those communications

5     with OCC?

6  A  Paper submission, e-mail, phone.

7  Q  Was there a particular person at OCC that you

8     primarily communicated with?

9  A  Steven Kime.

10  Q  And can you spell that?

11  A  K-i-m-e.

12  Q  And was there a time that that responsibility

13     was transitioned away from you?

14  A  Yes.

15  Q  When was that?

16  A  After the Talmer acquisition.

17  Q  And do you recall more specifically when that

18     was?

19  A  Sometime between January and April of 2013.

20  Q  And why do you say April of 2013?

21  A  That's when the formal communication was

22     produced that I was no longer responsible for

23     that area.

24  Q  What did you receive in April of 2013?

25  A  The same communication everybody in the bank

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 40

1      did.

2  Q   Which is what?

3  A   That Tim Regan from Talmer now has sole

4      responsibility for each of these areas.

5  Q   For each of these areas meaning what?

6  A   Compliance with consenter.

7  Q   Any other areas?

8  A   Internal audit, security, BSA.

9  Q   And you said BSA.  What's BSA?

10 A   Bank Secrecy Act.

11 Q   Any other items?

12 A   Loan review was transitioned out as well as

13     appraisal review.  Corporate information

14     security was transitioned out.

15 Q   And these changes occurred in April of 2013?

16 A   That was the formal communication.

17 Q   So that's when they took effect?

18 A   That's when it was formally communicated

19     bank-wide, but the changes predated the

20     communication.

21 Q   And was there any communication to you about

22     those changes before April of 2013?

23 A   I saw the e-mail for the first time as

24     everybody else did.

25 Q   In April of 2013?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 41

```
 1   A   Correct.
 2   Q   So there was no statement to you, whether
 3       through documents or verbally, that those
 4       changes were going to occur until April of
 5       2013?
 6   A   I read the communication for the first time in
 7       April of 2013.
 8   Q   Correct.  And my question is broader than that.
 9       I'm saying there was no statement to you at all
10       before April of 2013 that those changes were
11       taking place.
12   A   No.
13   Q   Is that correct?
14   A   That is correct.
15   Q   And so up until April of 2013, it was simply
16       your sense that they would take place?
17   A   The sense from my directs was that I was no
18       longer in charge because there being directives
19       from Talmer.
20   Q   And when you say your "directs," those are the
21       people that were reporting to you?
22   A   Correct.
23   Q   So they were receiving direction from Talmer
24       and that gave you the impression that you were
25       no longer in charge?
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 42

 1   A   Correct.

 2   Q   And when did that direction start?

 3   A   I don't know that there's a specific date where

 4       we can say it began.

 5   Q   Did there come a time that you went on leave?

 6   A   I was walked out of First Place Bank the day

 7       after I submitted my termination for good cause.

 8   Q   Who walked you out?

 9   A   Greg Carr.

10   Q   All right.  And you indicated that you were

11       terminated at that time?

12   A   I submitted my termination for good cause the

13       day before.

14   Q   Did that in your mind terminate your employment

15       with First Place Bank?

16   A   Yes.

17   Q   And did Mr. Carr indicate to you that your

18       employment would be terminated?

19   A   Mr. Carr did not speak of the termination for

20       good cause.

21   Q   All right.  Well, let's take a look at that.

22                   - - - - -

23           (Plaintiff's Exhibit No. 3 was marked.)

24                   - - - - -

25   Q   I'm showing you what's been marked as Exhibit

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 43

```
 1       Number 3 for purposes of your deposition.  And
 2       do you recognize this as an e-mail that you
 3       sent to -- well, this is indicated to yourself
 4       at the bottom, but then above that, there's an
 5       e-mail from you to Mr. Shafer dated July 12th,
 6       2013.  Do you see that?
 7    A  Yes.
 8    Q  And attached to this e-mail is a document
 9       entitled Notice of Condition Leading to
10       Termination for Good Reason.  Do you see that?
11    A  Yes.
12    Q  And you e-mailed this to Mr. Shafer on July 12,
13       correct?
14    A  The document was e-mailed and delivered in hard
15       copy.
16    Q  And did you personally deliver it in hard copy?
17    A  I did.
18    Q  Did you hand it to Mr. Shafer?
19    A  Mr. Shafer was not in Ohio at the time and Kim
20       Wadman, his assistant, received it.
21    Q  So you handed her the document entitled Notice
22       of Condition Leading to Termination for Good
23       Reason and asked her to give it to Mr. Shafer?
24    A  That's correct.
25    Q  And that would have occurred around the same
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 44

1    time that you sent the e-mail?

2  A  Exactly the same time.

3  Q  So 5:03 p.m. on July 12th?

4  A  Correct.

5  Q  And did you have any discussions about this

6    notice with anyone at First Place Bank on

7    July 12th, 2013?

8  A  No.

9  Q  So that I take it you left and went home for

10    the night after you handed this in?

11  A  I don't recall immediately leaving.  I probably

12    continued to work that day.

13  Q  So you worked, but then ultimately went home

14    for the evening at some point, correct?

15  A  At some point, yes.

16  Q  And then came back to work the next day; is

17    that right?

18  A  On Monday, yes.

19  Q  So this was a Friday?

20  A  Correct.

21  Q  So you came back in on Monday.  Were you

22    believing that you were going to continue to be

23    employed at First Place Bank or were you coming

24    in to collect your things?

25  A  I don't recall the frame of mind on Monday

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 45

```
 1        other than I showed up for work.
 2   Q    Well, did you believe you had submitted
 3        essentially a resignation letter to First Place
 4        Bank on that Friday?
 5   A    I submitted Termination for Good Reason on the
 6        previous Friday which gave the bank 30 days to
 7        address.
 8   Q    And in that 30 days, was it your understanding
 9        that you would remain employed by First Place
10        Bank?
11   A    For 30 days, correct.
12   Q    And at some point, Mr. Carr approached you and
13        asked you to leave?
14   A    No.
15   Q    How did it come about that Mr. Carr walked you
16        out of the offices as you indicated?
17   A    Mr. Carr sought me out from a meeting in the
18        first floor of the bank, asked me to come to
19        the legal conference room, and upon entering
20        the legal conference room, it was full of First
21        Place Bank HR and legal staff.
22   Q    Okay.  What happened after that?
23   A    I essentially was told that I'd be walked out
24        the door and most of that conversation was a
25        blur.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 46

1   Q   Do you recall anything at all from that
2       discussion?
3   A   Essentially I was being walked out.  Yeah.  I
4       was asked to return my badge, my system access
5       had been eliminated, and I was given a box and
6       some time to clean out some personal effects
7       from my office.
8   Q   And were you told that you were being placed on
9       suspension or leave or were you told that you
10      were being terminated, or do you recall
11      anything like that?
12  A   I don't recall what the formality was.
13  Q   Did you discuss this Notice of Condition
14      Leading to Termination for Good Reason with
15      anyone other than this meeting that you just
16      testified about that you were asked to attend
17      with Mr. Carr?
18               MS. KRAMER:           Objection.
19      You can go ahead and answer, Gary.
20  A   I don't understand the question.
21  Q   Other than what you've indicated in connection
22      with your discussion with Mr. Carr and anyone
23      else in the legal conference room as you
24      testified, did you have any discussion with
25      anyone about this notice that you submitted on

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 47

1          July 12th?

2    A    Are we speaking of individuals at the bank?

3    Q    Actually, I'm speaking of anyone.

4    A    Outside of counsel, I don't believe so.

5    Q    So just so we're clear, you submitted this on

6          Friday, July 12th at the end of the day, you

7          came back to work on Monday, you were working

8          for some period of time until Mr. Carr pulled

9          you out of the meeting and asked you to go to a

10         conference room with other people.  Is that

11         right?

12   A    Correct.

13   Q    At that point in time, you were told that you

14         were going to be walked out of the bank, but

15         you don't recall anything else from that

16         discussion?

17   A    Correct.  I remember turning my badge in.

18   Q    You turned your badge in and were told that

19         your access was going to be terminated at that

20         point; is that right?

21   A    Correct.

22   Q    And then you collected your things and were

23         walked out by Mr. Carr; is that right?

24   A    Correct.

25   Q    You did not on that day talk with anyone else

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 48

1     at the bank about this Notice of Condition

2     Leading to Termination for Good Reason; is that

3     right?

4   A   Correct.

5   Q   Now, is it correct that prior to submitting

6     this notice, you had received legal counsel

7     about this?

8   A   Correct.

9   Q   Who was your legal counsel at that time?

10  A   I worked with an individual named Neil

11    Klingshirn.

12  Q   And when did you first meet with Mr. Klingshirn

13    about this?

14          MS. KRAMER:        Objection.

15    You can answer to the extent that you're not

16    going to reveal any confidential communications,

17    but --

18  Q   Yes.  I'm just looking for a date.

19  A   It would have been prior to July 12th.  I don't

20    recall.

21  Q   And do you recall how long prior?

22  A   I don't recall.

23  Q   In the notice, which is Exhibit 3, you indicate

24    in the second line, "Specifically, since

25    April 15, 2013, First Place Bank has materially

Deposition of  Gary  Kausmeyer  , taken January 20, 2016

Page 49

1      demoted me, reassigned to me duties and

2      responsibilities that are not consistent with

3      my experience, expertise and position,"

4      et cetera.  Do you see that?

5   A   Yes.

6   Q   And the date April 15, 2013, is that in

7      relation to the e-mail notice that you

8      testified about earlier concerning Mr. Regan's

9      responsibilities?

10  A   Correct.

11  Q   So in terms of the Notice of Condition Leading

12     to Termination for Good Reason, you were

13     focused on that April 15th date?

14  A   Correct.

15  Q   And why did you wait until July 12th to submit

16     this notice if you had received this demotion

17     on April 15?

18  A   Change in Control provided that I must

19     communicate in writing within 90 days of the

20     event that led to Termination for Good Reason.

21  Q   So that would have given you essentially a

22     deadline of July 15th, right?

23  A   Correct.

24  Q   But why did you wait until July 12th to submit

25     it?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 50

1  A   It took that long to compose.

2  Q   But you believe that the claim essentially

3      under the Change in Control Agreement had

4      arisen as of April 15, 2013?

5              MS. KRAMER:          Objection.

6      You can go ahead and answer.

7  A   That's correct.

8  Q   And do you recall mentioning this claim to

9      anyone else at First Place Bank or Talmer

10     before you submitted it on July 12th?

11 A   No.

12              - - - - -

13          (Plaintiff's Exhibit No. 4 was marked.)

14              - - - - -

15 Q   I'm going to hand you what's been marked as

16     Exhibit Number 4 for purposes of your

17     deposition.  All right.  And this is an e-mail

18     chain.

19          If you go to the bottom, it starts with

20     an e-mail from you to Mr. Regan, Friday,

21     June 28th at 9:56 p.m.  Do you see that?

22 A   Yes.

23 Q   And do you recall writing this e-mail?

24 A   If I have an opportunity to read it, I will --

25 Q   Yes, please.  Go ahead.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 51

1    A    -- answer that.

2    Q    You've had a chance to look at that?

3    A    Yes.

4    Q    Do you recall writing the e-mail at the bottom

5         which is Friday, June 28th at 9:56 p.m.?

6    A    I vaguely remember this, yes.

7    Q    And you indicate that you've "experienced a

8         material change in" your "job responsibilities

9         during the two-year period where I am legally

10        protected by a Change of Control Agreement,"

11        correct?

12   A    Yes.

13   Q    And you said, "This document is now going to

14        serve as the beginning of a conversation with

15        individuals at First Place Bank who are

16        responsible for addressing such matters,"

17        correct?

18   A    Yes.

19   Q    And so you were anticipating after essentially

20        giving notice that you believed you had a claim

21        under the Change in Control Agreement, that

22        there would be a discussion with folks at First

23        Place Bank?

24              MS. KRAMER:          Objection.

25        You can go ahead and answer.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 52

```
 1   A    I'm sorry.  Could you repeat your question?

 2   Q    Sure.

 3             You believed after you submitted notice

 4        in this document, as you state, "This document

 5        is now going to serve as the beginning of a

 6        conversation," you believed that this would

 7        start a discussion with folks at First Place

 8        Bank?

 9   A    In regards to the job description, yes.

10   Q    Okay.  And Mr. Regan responds that "OCC"

11        "formally prohibited First Place from renewing

12        the Change in Control Agreement that you

13        reference.  As such, it was terminated."  Do

14        you see that?

15   A    Yes.

16   Q    So you were aware at this point that it was the

17        bank's position that you would not be entitled

18        to any reimbursement or any payment under the

19        Change in Control Agreement?

20   A    Yes.

21   Q    And you indicate in response that, other than

22        your name, "the first paragraph was copied and

23        pasted."  What do you base that on?

24   A    There was I believe another e-mail that had the

25        exact same language that either was forwarded
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 53

1      to me or I had purview to review and it was

2      exactly the same e-mail that was provided to me.

3   Q   And do you recall who that e-mail was from?

4   A   I do not.

5   Q   All right.  I just want to show you Exhibit 5

6      which is another e-mail chain.

7                   - - - - -

8           (Plaintiff's Exhibit No. 5 was marked.)

9                   - - - - -

10  Q   And if we -- this is an e-mail chain between

11     you and Mr. Regan that goes back to June 26 of

12     2013.  And you can feel free to look at as much

13     of it as you'd like, but I want to ask you a

14     question about the e-mail on the first page

15     from Mr. Regan to you dated Friday, June 28th

16     at 2:52 p.m.

17  A   2:52.  Okay.

18  Q   And he indicates, he finds the update on your

19     proposed surgery good news, keep him informed,

20     and that he's "happy to hear" you're "available

21     to continue with your oversight of the OCC

22     related items," but he would "still like to

23     plan in the event that your schedule changes

24     and" "follow through with" his "request for a

25     complete list of items that you are working on

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 54

1       or have the responsibility for ensuring" "are

2       complete."  Do you see that?

3   A   Yes.

4   Q   And you respond at 4:23 on the same day that

5       you would do that after hours because you

6       needed to speak with the people who reported to

7       you; is that right?

8                   MS. KRAMER:          Objection.

9   A   All I reference is "folks."  I don't reference

10      who those folks were and I don't recall the

11      context of that statement.

12  Q   Okay.  But you needed to finish your work

13      during the day while people were available is

14      the context?

15  A   Yes.

16  Q   And so when we look at the document Exhibit 4

17      we were just looking at, which is the same day

18      as this e-mail exchange we just saw in

19      Exhibit 5, June 28th, it would be correct that

20      the e-mail you sent June 28th, 9:56 p.m. was

21      your further response to Mr. Regan's request

22      for the list of items you're working on?

23  A   That's what it appears, yes.

24  Q   When you had indicated in the e-mail in

25      Exhibit 4 that you wanted to start a

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 55

1    conversation, did you anticipate some

2    negotiation with the folks at First Place Bank

3    about your claim under the Change in Control

4    Agreement?

5  A  I don't recall if that was the context of the

6    conversation.

7  Q  And after July 12th -- excuse me.  After

8    July 15th when you indicated that you were

9    walked out of First Place Bank, when was the

10   next communication with anyone at First Place

11   Bank that you recall?

12 A  I was told on July 15th, which was a Monday,

13   that I would be contacted by that Friday by

14   someone from the bank.

15 Q  You were told this before you left or you were

16   contacted at home?

17 A  Before I left.

18 Q  Who told you that?

19 A  I don't recall who in the conference room.

20 Q  And when was the next communication after

21   July 15th that you recall receiving?

22 A  Friday, July 19th came and passed with no

23   communication from anyone with the bank.

24 Q  My question is when was the next communication

25   that you received.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 56

1   A   It would have been sometime after that.

2   Q   Do you recall when it was?

3   A   I do not.

4   Q   And do you recall who made that communication?

5   A   I do not.

6   Q   Did you reach out to the bank at any point

7       after that?

8   A   No, I did not.

9   Q   Now, you just indicated that you were told on

10      July 15th in the meeting in the legal

11      conference room that you would be contacted by

12      Friday, July 19th.  Is there anything else from

13      that discussion that you now recall?

14  A   That was pretty much the next deliverable point

15      of contact, so all I knew is that I was being

16      walked out and I would hear something by Friday.

17  Q   And you don't recall anything else from that

18      discussion that was said to you?

19  A   Nothing -- nothing specific.  I mean there was

20      conversation, but I don't recall specific.

21  Q   And you've testified, whether general or

22      specific, you've already testified as to

23      everything you recall happening in that meeting

24      on July 15th that you can remember?

25  A   Yes.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 57

1                    - - - - -

2          (Plaintiff's Exhibit No. 6 was marked.)

3                    - - - - -

4    Q   I'm going to show you what's been marked

5        Exhibit 6 for purposes of your deposition, and

6        this is an e-mail to you at your Gmail address

7        dated September 2, 2013 from Sandy Kuohn at the

8        bottom.  Do you see that?

9    A   Yes.

10   Q   And then above that, there is another e-mail

11       the next day from Ms. Kuohn to you as well.  Do

12       you see that?

13   A   Yes.

14   Q   And she indicates that, "We're now ending your

15       Administrative Leave/Suspension and requesting

16       that you return to work this Thursday,

17       September 5th at 8:30 a.m. in Warren."

18            Do you recall receiving that e-mail?

19   A   Yes.

20   Q   And would that have been the first

21       communication that you had received from

22       anybody at First Place Bank or Talmer since

23       July 15 of 2013?

24   A   There had to be prior communication.

25   Q   Okay.  And why do you say that?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 58

1   A   Because my surgery was at the end of July and

2       somebody would have been made aware of that.

3   Q   Who would have been made aware of that?

4   A   Human resources.

5   Q   And you would have called them and told them

6       that?

7   A   I don't recall how they were contacted, but I

8       do recall receiving FMLA paperwork from human

9       resources.

10  Q   FMLA paperwork from human resources, you recall

11      receiving that sometime between July 15, 2013

12      and September 2, 2013?

13  A   Yes.

14  Q   And you would have received those either by

15      e-mail or in the mail?

16  A   Or in person.

17  Q   Did you return to First Place Bank between

18      July 15, 2013 and September 5, 2013?

19  A   If I did, it would have been prior to my

20      surgery, and, again, whether I showed up in

21      person to receive the documents or they were

22      mailed, I don't recall.

23  Q   Other than your receipt of documents regarding

24      FMLA leave at some point in July of 2013, do

25      you recall any other communications with anyone

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 59

1      at First Place Bank between July 15, 2013 and

2      this e-mail that you received from Sandy Kuohn

3      on September 2, 2013?

4   A  There would have had to have been communication,

5      yes.

6   Q  Okay.  And so why do you say that?

7   A  Between myself and human resources.

8   Q  And I just excluded the communication on the

9      FMLA in that question.

10  A  Well, the communications extended beyond FMLA,

11     so whatever content or context of conversation

12     outside of FMLA, that would have occurred with

13     HR as well.

14  Q  And what were those communications?

15  A  I provided doctors' notes to them, other

16     documentation they requested.

17  Q  And how did you do that?

18  A  Again, I'm assuming it would have been in

19     person.  I don't recall mailing anything in, so

20     I believe I would have had to have met with

21     somebody at the institution.

22  Q  So you came in and dropped off documentation

23     relating to your medical situation?

24  A  I had to, yes, deliver -- deliver that

25     information to them.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 60

1   Q   And do you remember the name of anyone you

2       coordinated with or communicated with regarding

3       these matters?

4   A   Our employees in HR.  I remember Donna Boggs

5       would have been one point of contact.  She was

6       in HR.

7   Q   And do you recall how many times you would have

8       returned to First Place Bank to have these

9       communications?

10  A   I do not.

11  Q   And other than the communications about FMLA

12      and substantiation of your medical treatment,

13      did you have any communications with anyone at

14      First Place Bank between July 15, 2013 and

15      September 2 of 2013?

16  A   As I said earlier, I assume there were.  I just

17      don't recall specifically.

18  Q   When you say you "assume there were," what

19      would those have involved?

20  A   The conversation that we just had about pending

21      surgery, FMLA, providing documentation.

22  Q   And I meant to exclude those.  Let me try to

23      see if you can understand this question.

24          Other than the communications that you

25      just described relating to FMLA and your

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 61

1    medical treatment with HR, other than those

2    communications, do you recall any communications

3    with anyone at First Place Bank between July 15,

4    2013 when you left and September 2, 2013 when

5    you received this e-mail from Sandy Kuohn which

6    we're looking at as Exhibit 6?

7  A  I don't recall specifically.

8  Q  And do you recall generally any topics of

9    communication or anything like that?

10 A  There would have been conversations about, you

11   know, the procedure, and then I do believe at

12   different points during the recovery process

13   there would have been updates provided.

14 Q  Updates in what regard?

15 A  In regards to how I was doing postop.

16 Q  And this, again, would have been with HR

17   people?

18 A  I believe so, yes.

19 Q  And, again, I really want to get to anything

20   you remember outside of your communications

21   with HR.  Do you understand that?

22 A  Outside of HR, I don't recall being contacted

23   by anybody at the bank outside of HR.

24 Q  And you didn't initiate any contact with

25   anybody at the bank outside of HR?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 62

1   A   I don't believe so.

2   Q   And so you would have received this e-mail from

3       Ms. Kuohn asking that you attend a meeting on

4       September 5 in Warren; is that right?

5   A   Correct.

6   Q   And do you recall attending that meeting?

7   A   Yes.

8   Q   Who was at that meeting?

9   A   I do believe Sandy did participate in that

10      meeting.  I believe Mr. Wolfe was probably

11      present as well as Ms. Tomlinson, Karen

12      Tomlinson.

13  Q   Anyone else that you recall?

14  A   I don't recall anybody else being there.

15  Q   And do you recall at that meeting that you were

16      told your leave would be ending?

17  A   She -- yes.  I mean yeah.  From the e-mail, I

18      knew that walking in.

19  Q   What do you recall happening at that meeting?

20  A   I believe Ms. Kuohn provided information in

21      regards to having me permanently leave the

22      company.

23  Q   So were you told that First Place Bank wanted

24      to arrange for the termination of your

25      employment?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 63

1  A  I believe she had said that, yes.

2  Q  And were you offered some options to consider?

3  A  Yes.

4  Q  And was one of the options essentially that you

5     would be immediately terminated?

6  A  Yes.

7  Q  With no severance or anything like that?

8  A  Yes.

9  Q  Another option would be to agree on a

10    termination date with a bonus and a severance

11    arrangement; is that right?

12 A  Yes.

13 Q  And you guys discussed these options at the

14    meeting, correct?

15 A  Yes.

16 Q  And do you recall indicating at the meeting

17    that you wanted to enter into discussions about

18    an agreed -- agreed terms for your termination?

19 A  Yes.

20 Q  And did they indicate to you that they would be

21    providing documents for you to review?

22 A  Yes.

23 Q  Other than what we just discussed here, what

24    you just testified to, do you recall anything

25    else being discussed at that meeting?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 64

1    A    I do recall inquiring about the expense

2         reimbursements.

3    Q    And what do you recall being discussed about

4         expense reimbursements?

5    A    That they would have to check with Mr. Shafer

6         on the status.

7    Q    So you inquired about the status of the expense

8         reimbursement that you had made in April of

9         2013, correct?

10   A    Correct.

11   Q    And they said they would have to check on that?

12   A    Correct.

13   Q    Anything else other than what you testified to

14        that you recall happening at that meeting?

15   A    I believe that's all I can recall.

16                  MR. WARE:          It's going to

17        take me a second to mark these.  Do you guys

18        need a break or -- I don't need one, but if you

19        want one.

20                  THE WITNESS:       Sure.

21                  THE VIDEOGRAPHER:   Off the

22        record.  The time is 10:59.

23                  (Short break taken.)

24

25                       - - - - -

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 65

1          (Plaintiff's Exhibits Nos. 7A, 7B, 7C and

2      7D were marked.)

3               - - - - -

4               THE VIDEOGRAPHER:    Back on the

5      record.  The time is 11:05.

6  BY MR. WARE:

7  Q   Mr. Kausmeyer, I'm going to hand you what's

8      been marked for purposes of our deposition as

9      7A, 7B, 7C and 7D and they're clipped together

10     here.

11 A   Sure.

12 Q   And so if you take a look at this, the first

13     document, 7A, is an e-mail from you to

14     Mr. Kowalski dated September 6th, 2013, and

15     the subject is Documentation for Consideration.

16     Excuse me.  Do you see that e-mail?

17 A   Yes.

18 Q   And do you recall receiving that?

19 A   Yes.

20 Q   And he says, "The attached is in follow-up to

21     our discussion on Thursday.  We look forward to

22     your feedback.  Rob."

23          Do you see that?

24 A   Yes.

25 Q   And do you recall that Mr. Kowalski was a part

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 66

1       of that meeting that you had had that you just

2       testified about on September 5th?

3    A  I don't recall specifically.  I know I was in

4       a meeting with Rob at some point in the HR

5       conference room.  Whether it was on that

6       specific date or not, I can't -- I can't

7       recall.

8    Q  All right.  And so then we have as 7B, 7C and

9       7D the attachments, and do you recognize

10      Exhibit 7B as the first draft of a cover letter

11      to you relating to the termination of your

12      employment?

13   A  Yes, this appears to be the first draft.

14   Q  And 7C, do you recognize that as the first

15      draft of the Project Completion Agreement that

16      Mr. Kowalski sent to you?

17   A  Yes.

18   Q  And then 7D, would that be the first draft of

19      the Separation Agreement and General Release

20      that Mr. Kowalski sent to you?

21   A  Yes.

22   Q  And do you recall what you did when you

23      received these documents?

24   A  I downloaded and reviewed them.

25   Q  Did you review them with counsel?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 67

1  A  At some point, yes.  I don't recall how
2     quickly.
3  Q  Do you recall discussing them with anyone other
4     than your counsel or anyone at First Place
5     Bank?
6  A  There were communications between the bank and
7     myself after receiving these documents.
8  Q  Other than communications with the bank, did
9     you discuss them with anyone other than counsel?
10 A  No.
11 Q  But after you received these, you discussed
12    some comments that you had with Sandy Kuohn; is
13    that right?
14 A  Yes.  She would have been one individual.
15 Q  And did you discuss your comments with anyone
16    else that you recall?
17 A  I believe Sandy took the lead role from that
18    point forward, and then I believe most of my
19    communications, if not all, would have been
20    with or through Sandy.
21             - - - - -
22        (Plaintiff's Exhibit No. 8 was marked.)
23             - - - - -
24 Q  I show you what's been marked as Exhibit 8.
25    This is an e-mail exchange between yourself and

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 68

1      the folks at First Place Bank.  If we go to the

2      second page, the earliest e-mail, the bottom of

3      the second page is the e-mail we just looked at

4      as Exhibit 7 which is the e-mail forwarding the

5      draft agreement.  Do you see that?

6  A   Yes.

7  Q   And then you, going up the chain, you respond

8      to Mr. Kowalski's e-mail on Tuesday,

9      September 10, 2013 and you say, "Despite

10      forwarding the documents within the hour after

11      Rob sent them on Friday afternoon, none of the

12      firms were able to review and discuss with me

13      on short notice."

14          Are you talking about law firms that you

15      were going to --

16  A   Yes, yes.

17  Q   -- discuss with?

18          And then you asked for a reference letter

19      from the bank.  Do you see that?

20  A   Yes.

21  Q   Ms. Kuohn responds later that day, indicates

22      that she has a draft recommendation that's

23      being reviewed and will get it to you the next

24      day and asks for a conference call the

25      following Thursday.  Do you see that?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 69

1  A   Yes.

2  Q   Do you recall receiving that recommendation

3      letter?

4  A   Yes.

5  Q   And you indicate, "That sounds great!", and you

6      suggested a conference call?

7  A   Yes.

8  Q   Do you recall having that call with Ms. Kuohn?

9  A   I am certain it happened.  I don't recall

10     specifically when that happened or if, in fact,

11     it happened on the date that we initially

12     suggested.

13 Q   And I take it you were ultimately able to find

14     a law firm to help you review the documents?

15 A   Yes.

16 Q   And what attorney did you use for that purpose?

17 A   I believe I was still with Neil Klingshirn at

18     the time.

19 Q   And I know you indicated that you didn't recall

20     specifically the conference call with Ms. Kuohn,

21     but do you remember generally that you provided

22     some comments to her on the agreements that you

23     had?

24 A   Via e-mail, yes.

25 Q   You remember comments via e-mail.  Do you

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 70

1      remember giving your comments over the phone as

2      well?

3   A  I'm sure there were discussion points not

4      included in the e-mail.

5                  - - - - -

6          (Plaintiff's Exhibits Nos. 9A, 9B and 9C

7      were marked.)

8                  - - - - -

9   Q  So I'm going to hand you what's been marked for

10     purposes of our deposition as Exhibits 9A, 9B

11     and 9C, and these are -- do you recognize these

12     as subsequent versions of the cover letter,

13     Project Completion Agreement and Separation

14     Agreement and General Release that are dated

15     October 2nd, 2013?

16  A  Yes.

17  Q  And these are documents that were produced by

18     you to us.  Do you see that on the bottom?

19  A  Yes.

20  Q  Do you recall receiving these from Ms. Kuohn or

21     someone else at the bank after you discussed

22     the initial set of documents you had received

23     in September?

24  A  Yes.

25                  MS. KRAMER:        I want to

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 71

1      note an objection on the record.  The first 9A

2      and 9B have dates of October 2nd on them, but I

3      don't see any date of October 2nd on 9C, just

4      for purposes of clarification.

5   Q  And do you recall what you did when you would

6      have received the new documents from First

7      Place Bank?

8   A  I probably would have had them re-reviewed.

9   Q  Re-reviewed by your counsel?

10  A  And myself, yes.

11  Q  And do you recall providing comments on these

12     documents to the bank?

13  A  I'm sure there was additional discussion, yes.

14                   - - - - -

15          (Plaintiff's Exhibit No. 10 was marked.)

16                   - - - - -

17  Q  Okay.  Let's take a look at Exhibit 10.

18     Exhibit 10 is an e-mail or an e-mail chain

19     starting with an e-mail to you from Ms. Kuohn

20     on October 8th, 2013 and your response at the

21     top of the same date to Ms. Kuohn.  Do you see

22     that?

23  A  Yes.

24  Q  And Ms. Kuohn is responding to a voice mail

25     that you left her apparently indicating that

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 72

1      you were going to provide comments on the

2      documents.  Do you see that?

3    A   Yes.

4    Q   And you state in your response, "I forwarded my

5      draft e-mail last night for review and expected

6      an immediate turnaround.  I am still waiting to

7      here back this AM and will forward as soon as I

8      receive it."  Do you see that?

9    A   Yes.

10   Q   Is that talking about your e-mail with comments

11      on the agreements that you wanted to run by

12      your attorney first?

13   A   Yes.

14   Q   So when you're talking about "turnaround,"

15      you're talking about hearing from your attorney

16      on that?

17   A   Yes.

18                  - - - - -

19          (Plaintiff's Exhibit No. 11 was marked.)

20                  - - - - -

21   Q   Now I'll show you Exhibit 11, and this is an

22      e-mail to you from Ms. Kuohn later in the same

23      day as the e-mails we just looked at in

24      Exhibit 10, which is October 8th, forwarding

25      your comments on the document, correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 73

1        MS. KRAMER:        Objection.
2    This is an e-mail to Sandy from Gary.  You
3    indicated the other way around.
4        MR. WARE:        Okay.  I
5    apologize if I did.
6  Q  This is an e-mail to Ms. Kuohn from you dated
7    October 8th, 2013 forwarding your comments on
8    the documents; is that right?
9  A  Yes.
10 Q  And I take it -- I don't want to -- I'm not
11   going to ask you if your attorney made any
12   particular changes, but just in general, these
13   are your comments to the document that had been
14   reviewed by an attorney?
15       MS. KRAMER:        Objection.  I
16   don't think he needs to answer that.  That gets
17   into privileged communications.
18       I'm going to instruct you not to answer,
19   Gary.
20       MR. WARE:        I'm not sure
21   I agree, but that's fine.
22 Q  Let me just ask it this way:  You sent an
23   e-mail with your comments on the documents to
24   an attorney who reviewed that e-mail, and then
25   subsequently you sent these comments to -- on

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 74

1       the documents to Ms. Kuohn, correct?

2  A   I don't particularly recall which were my

3       comments and which were that of counsel.

4  Q   Right, and I'm not asking you that, but in

5       terms of your position with respect to the

6       agreement, whether it originated from your

7       counsel or you, these were your comments that

8       you were forwarding to the bank on the

9       agreements?

10  A   These were the comments that were forwarded to

11       the bank, yes.

12  Q   And you indicated here that you "would be

13       looking to execute these documents as fast as

14       they can be approved and updated." Do you see

15       that?

16  A   Yes.

17  Q   Were you in Florida at this time?

18  A   I don't recall if I was still in Ohio or if I

19       had already traveled to Florida. At some point

20       during the negotiations, I was in Florida, yes.

21  Q   But you don't remember as of October 8th; is

22       that right?

23  A   I don't recall, no.

24  Q   Now, among the comments that you had were

25       certain comments on the Project Completion

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 75

1      Agreement; is that right?

2    A   It appears we reference project bonus on page 1

3        of that e-mail.

4    Q   And you're talking about project bonus -- or

5        you reference project bonus.  You're talking

6        about what we've been calling the Project

7        Completion Agreement?

8    A   Correct.

9    Q   And also among your comments is, at the very

10       bottom of the last page, the second to last

11       paragraph, you say, "The Bank also agrees to

12       reimburse the employee for all applicable

13       business related expenses that will be

14       submitted no later than" October 11, 2013.  Do

15       you see that?

16   A   Correct.

17   Q   And that would have been in relation to

18       expenses you had not previously submitted to

19       the bank, correct?

20   A   Correct.

21   Q   And you ultimately did not submit any new

22       requests for expenses to the bank?

23   A   The deadline -- original deadline had passed,

24       so that would have been three days after this

25       e-mail, and so it -- yes, there was no

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 76

1      submission.

2   Q   And there was no submission after this deadline

3      either, correct?

4   A   No.  Huh-uh.

5   Q   The statement is correct?

6   A   The statement is correct.

7   Q   Now, there is no reference in this e-mail to

8      payment of outstanding expenses, is there?

9   A   I don't see the difference between that and the

10      second to last sentence.

11   Q   Well, the second to last sentence is talking

12      about "expenses that will be submitted no later

13      than" October 11, 2013.

14   A   And your question is in regards to the earlier

15      submission?

16   Q   Correct.

17   A   Correct.  Yes, I would agree with that.

18   Q   You would agree that there is no mention of

19      that in your e-mail?

20   A   Correct.

21   Q   It's going to take me just a minute.  I

22      apologize.

23           MR. WARE:       I'll give you

24      your copy if you want.  This is going to be 12A

25      continuing through the alphabet and I'll tell

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 77

1        you what we get to.

2                    MS. KRAMER:        Have these

3        been produced?

4                    MR. WARE:          Yes.

5                    MS. KRAMER:        Were they in

6        what was produced yesterday?

7                    MR. WARE:          I believe so.

8        I don't have the Bates number delineation to

9        know that for sure, but I believe that's

10       correct.  And some of these were also in your

11       production to us.

12                    MS. KRAMER:        Well, right,

13       and I'm looking at the first page and it's a

14       Talmer --

15                    MR. WARE:          Right.

16                    MS. KRAMER:        -- number.

17                    MR. WARE:          Yes.

18                    - - - - -

19          (Plaintiff's Exhibits Nos. 12A through

20       12K were marked.)

21                    - - - - -

22   BY MR. WARE:

23   Q   Mr. Kausmeyer, I'm handing you what's been

24       marked as Exhibits 12A through 12K.  If you

25       could just take a look through that,

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 78

1    familiarize yourself with what's there.  You

2    don't need to read every document.  I won't

3    have questions about all of them.

4  A  Do you know which ones you will so I can skim

5    those real fast?

6  Q  Certainly the first e-mail --

7  A  Okay.

8  Q  -- document, and then I think I will have some

9    brief questions on what will be -- one second --

10   12F.

11  A  Okay.

12  Q  Let me know when you've had a chance to read

13   the e-mail.

14  A  Okay.  I've read it.

15  Q  Okay.  You've read 12A?

16  A  Yes.

17  Q  Do you recall receiving this e-mail on

18   October 15, 2013 from Ms. Kuohn?

19  A  Yes.

20  Q  And this included revised versions of the

21   agreements that you had been discussing with

22   the bank along with some other documents,

23   correct?

24  A  Correct.

25  Q  And the attachments included the Employee Code

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 79

1    of Conduct and Code of Ethics Policy that were

2    in place at First Place Bank at the time,

3    correct?

4  A  Correct.

5  Q  It included up-dated versions and red-lined

6    versions showing the changes of the cover

7    letter, the Project Completion Agreement and

8    the Separation Agreement that we've been

9    discussing, correct?

10 A  Correct.

11 Q  And that it also included an Expense

12   Reimbursement Agreement, correct?

13 A  Yes.

14 Q  And then, finally, it included some information

15   regarding COBRA, election for healthcare?

16 A  Correct.

17              MS. KRAMER:        I just --

18   just for purposes of clarification, I see that

19   COBRA is attached, but it's dated August 22nd,

20   2013, and I don't see any reference to it.

21   Maybe I'm missing it, but it doesn't --

22              MR. WARE:          It's the

23   scanned 8190, so it was not a -- sent as a Word

24   document.

25              MS. KRAMER:        How are we

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 80

1      supposed to know that?

2                  MR. WARE:          It's produced

3      with -- the e-mail is something that exists and

4      has the attachments.  These are the attachments

5      to the e-mail and I'm happy to --

6                  MS. KRAMER:         All right.

7      And then --

8                  MR. WARE:          -- provide

9      that.

10                 MS. KRAMER:         -- what is,

11     there's a Separation Agreement and General

12     Release for a Friedrich Hayek?

13                 MR. WARE:          Yes.  There

14     was an error that you'll see Mr. Kausmeyer

15     noted in a subsequent e-mail as well that had

16     the wrong name in that document, but this is --

17     that was the attachment.

18                 MS. KRAMER:         So, again,

19     just for purposes of clarification, it looks

20     like the attachments when you look at page 1 of

21     12A are a release, Separation Agreement and

22     General Release, which you describe as the

23     release and covenant not to sue.

24         It looks like she's saying she's sending

25     clean and red-lined versions of the Separation

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 81

1      Agreement and General Release, but, in fact,

2      what she sends is a Separation Agreement and

3      General Release for Frederick Hayek and a

4      Separation Agreement and General Release for

5      Gary Kausmeyer.

6                      MR. WARE:            Right.  The

7      Friedrich Hayek one is the red-lined document,

8      and, you're right, it had a -- incorrectly

9      included the wrong name, but that was the

10     attachment, so that was what was attached.

11                     MS. KRAMER:          Okay.

12  BY MR. WARE:

13  Q   And the e-mail that we've been discussing, 12A

14      from Ms. Kuohn, you would have read that and

15      seen the bank's responses to your comments; is

16      that right?

17  A   Yes.  They were attached.

18  Q   And we've printed this in color so you can tell

19      where Ms. Kuohn responded to each of your

20      comments.  You can see that in red, correct?

21  A   Yes.

22                     MS. KRAMER:          Was that in

23      red when Gary originally received the e-mail?

24                     MR. WARE:            Yes.  That's

25      why we printed it that way.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 82

1                    MS. KRAMER:          Okay.

2  Q  And do you recall whether you sent the revised

3     versions of the documents, any other documents

4     to your attorney for review after receiving

5     them on October 15th?

6                    MS. KRAMER:          Objection.

7     You can answer.

8  A  I know we had multiple communications.  At what

9     point those communications with the attorney

10    ceased and after which draft, I don't recall

11    specifically, but more likely than not, I would

12    have taken the precaution of forwarding this

13    back to the attorney for review.

14 Q  And if we look at Exhibit 12F, that's a

15    red-lined version of the Project Completion

16    Agreement; is that right?

17 A  That is a red-lined version.

18 Q  So the Project Completion Agreement had been

19    changed in response to your comments on the

20    documents; is that correct?

21 A  It appears some changes have been incorporated,

22    yes.

23 Q  Okay.  And I take it by this point you had read

24    the Project Completion Agreement certainly more

25    than once; is that right?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 83

1  A  I have reviewed on multiple occasions the

2     Project Completion Agreement, yes.

3  Q  And so you understood that it called for the

4     payment of a bonus to you of $26,666 if you met

5     certain conditions, correct?

6  A  That's what the document says, yes.

7  Q  And among those conditions was that you would

8     remain employed at First Place Bank through at

9     least November 8, 2013, correct?

10 A  Are you referencing something specific?

11 Q  I'm referencing the Project Completion

12    Agreement.  It would be the third paragraph.

13 A  Third paragraph.  Let's see.  Yes.  Yes, that

14    is correct.

15 Q  And you understood that the Project Completion

16    Agreement had a release provision that released

17    all claims that you had against First Place

18    Bank?

19 A  Yes.

20 Q  And you understood that that included claims

21    under the Change in Control Agreement?

22 A  That I was told did not exist, yes.

23 Q  Right, that the bank's position was was not in

24    place, correct?

25 A  Correct.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 84

1  Q   But you understood that this release was

2      intended to and expressly referenced the Change

3      in Control Agreement?

4                  MS. KRAMER:          Objection.

5      You can answer.

6  A   I understood that I was waiving a right that

7      didn't exist.

8  Q   Well, you believed it existed I take it?

9  A   I had acted in accordance that if it did exist,

10     I would protect any future claims, but at the

11     time and based on the bank's activities, they

12     made clear that they believed it did not exist.

13 Q   You hadn't withdrawn your claim that you had

14     made in the Notice of Termination at that

15     point, had you?

16 A   Had not withdrawn, no.

17 Q   You believed you were entitled to a payment

18     under the Change in Control Agreement at this

19     time?

20 A   Yes.

21 Q   And among the other things -- among other

22     things that the bank indicated in its responses

23     to your comments was that it accepted your

24     request for reimbursement of expenses per the

25     First Place Bank expense policy and the

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 85

1       Kausmeyer offer letter.  Did you see that?

2   A   I do recall reading that, but what page is that

3       on?

4   Q   It's on page what's marked as Talmer 804.

5   A   Yes, I see that.

6                   - - - - -

7           (Plaintiff's Exhibit No. 13 was marked.)

8                   - - - - -

9   Q   I'm showing you what's been marked Exhibit 13

10      and this is another e-mail chain.  If you go to

11      the third page of the document, you'll see that

12      the first e-mail in the chain is the e-mail

13      that you sent to Ms. Kuohn with your comments.

14      Do you see that?

15  A   Yes.

16  Q   And then we have the e-mail we just looked at

17      from October 15th that was Ms. Kuohn's e-mail

18      to you attaching the various new versions of

19      the documents.  Do you see that?

20  A   Yes.

21  Q   So then one e-mail above that is your response

22      to that e-mail on October 17, 2013.  Do you see

23      that?

24  A   Yes.

25  Q   And October 17 was a date that Ms. Kuohn had

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 86

1          set for the deadline for you to sign these

2          documents, correct?

3     A    Per her e-mail of October 15, she did note she

4          was moving the deadline to Thursday, October 17

5          at 10:00 a.m.

6     Q    And so if you look at your e-mail, the top of

7          the second page of Exhibit 13, you indicated

8          that you had checked your e-mail and done some

9          other things in accordance with the bank's

10         expectations for your job performance, but you

11         indicate in the second paragraph that it would

12         be impossible for you to comply with the

13         deadlines outlined.  Do you see that?

14    A    Yes.

15    Q    And you also say that one of the -- you noted

16         that one of the red-lined documents did not

17         have your name on it, correct?

18    A    Yes.

19    Q    And you indicated you need some time to review

20         the documents, figure out if anything was

21         missing, and then you would get back with a

22         date to come in and execute the final version

23         of the documents.

24    A    Yes.

25    Q    Do you see that?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 87

 1  A  Yes.

 2  Q  So then Ms. Kuohn responds, if you look at the

 3     first page, the next day, "I understand.  Let's

 4     set next Tuesday at 10:00 a.m.  That provides a

 5     full week."  Do you see that?

 6  A  Yes.

 7  Q  All right.  And this is October 18 which would

 8     have been a Friday.  You respond on October

 9     22nd which would have been that following

10     Tuesday.  Do you see that at the top?

11  A  Yes.

12  Q  And you indicate that you'll provide a more

13     appropriate timeline once you receive the

14     corrected documents and those that are still

15     missing and, "I have not yet received this list

16     back, as it has only been 2 business days since

17     receipt, but I will forward to you for your

18     action when I receive it."  Do you see that?

19  A  Yes.

20  Q  And were you expecting a list from your

21     attorney at that point?

22  A  I don't recall the origin of the list, but I

23     felt that I would be able to recognize --

24     once the additional documents were sent, I'd

25     reconcile that back to what was requested.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 88

1       That's something that I could have performed.

2    Q  Okay.  Well, it indicates here you're waiting

3       for a list from someone and you were going to

4       forward it to Ms. Kuohn for action when you

5       received it.  Did you see that?

6    A  Yes.

7    Q  Do you know who you were waiting for a list

8       from?

9    A  I believe it was the bank.

10   Q  Well, why would you need to forward it to

11      Ms. Kuohn when you received it?

12   A  Because I need to receive the corrected

13      documents, and any documents that were still

14      missing, I would need to receive, have

15      reviewed, and then forward those back.

16   Q  You would forward --

17   A  The process for all this has been, bank sends,

18      I have receipt, have it reviewed, resubmit to

19      the bank, bank then looks at it, does the same

20      process, forwards it back, so we're just going

21      about our normal communication back and forth.

22   Q  And you would have done that when you got these

23      documents?

24   A  That I was still waiting on, yes, and then I

25      would need to have them reviewed.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 89

```
 1                    - - - - -
 2          (Plaintiff's Exhibit No. 14 was marked.)
 3                    - - - - -
 4   Q    Okay.  I'm handing you what's been marked as
 5        Exhibit 14, and, again, this is an e-mail chain
 6        which picks up on the one we were just looking
 7        at.  So if you go down to the second page,
 8        you'll see the e-mail that we just looked at in
 9        Exhibit 13 which is your October 22nd e-mail to
10        Ms. Kuohn.
11   A    Correct.
12   Q    And she responds that same day.  I think you
13        had sent it at 12:16 a.m., so you had sent it
14        essentially in the middle of the night.  She
15        responded at 8:44 a.m. that Tuesday that she
16        was traveling, "Please list out what you are
17        waiting for."  Do you see that?
18   A    Yes.
19   Q    And then later the same day she sends you
20        another e-mail, says that she's reread your
21        earlier e-mail and doesn't "see a list of
22        documents you feel are missing.  Please send
23        over the list to me today so we can move this
24        forward."  Do you see that?
25   A    Yes.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 90

1   Q   Okay.  Do you recall sending Ms. Kuohn that

2       list at any point?

3   A   I do not recall, no.

4   Q   And do you recall any discussions with Ms. Kuohn

5       specifically around this time about completing

6       the documents for signature?

7   A   I had communicated with Ms. Kuohn, yes, on a

8       number of occasions.

9   Q   Right, and I'm asking specifically about this

10      list or any documents you thought were missing.

11      Do you recall any verbal communications with

12      Ms. Kuohn on that topic?

13  A   There may have been.  I don't recall.  But I do

14      know that eventually the corrected documents

15      did make their way to me, so there had to be

16      some sort of communication in order to receive

17      those.

18                     - - - - -

19          (Plaintiff's Exhibit No. 15 was marked.)

20                     - - - - -

21  Q   Okay.  I'm going to show you what's been marked

22      as Exhibit 15.

23          So you did eventually at some point get

24      the documents you were looking for that you

25      thought were missing?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 91

```
 1   A   It appears that, yes, they were -- they were
 2       forwarded.  The correct documents were
 3       forwarded.
 4   Q   So what we're looking at in Exhibit 15 is two
 5       e-mails from Ms. Kuohn.  I want to focus first
 6       on the one on the second page which actually
 7       you have to look at the bottom of the first
 8       page to get the date which is Monday,
 9       October 28th.
10   A   Uh-huh.
11   Q   And she sends you an e-mail saying, "We need to
12       finalize this situation tomorrow.  I look
13       forward to receiving your signed documents and
14       please let me know if you have any questions
15       today."  Do you see that?
16   A   Yes.
17   Q   Do you recall getting that e-mail from
18       Ms. Kuohn?
19   A   Yes.
20   Q   And had there been discussions prior to that in
21       which you had indicated that you would be
22       getting signed documents to her?
23   A   I'm sure, yes.
24   Q   Before we look at the first one, I want to show
25       you what's been marked as Exhibit 16.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 92

```
 1                    - - - - -
 2          (Plaintiff's Exhibit No. 16 was marked.)
 3                    - - - - -
 4  Q   So the first e-mail in the chain on Exhibit 15
 5      was dated October 28th at 1:54 p.m., and if you
 6      look at Exhibit 16, you'll see that it's an
 7      e-mail to you from Ms. Kuohn dated the same
 8      day, October 28th, at 2:58 p.m., so, you know,
 9      an hour or two later.  Do you see that?
10  A   Yes.
11  Q   And she indicates she "received your voicemail
12      from today and" "tried to call you back," but
13      your voicemail was full, and that she had
14      previously delivered updated documents.  And
15      then says, "I don't see a need for you to
16      travel back to take care of this.  We just need
17      you to sign the documents and FedEx them to my
18      attention."
19          Do you see that?
20  A   Yes.
21  Q   Do you recall what you had indicated to her in
22      that voice mail?
23  A   It was -- I don't recall, no, I don't.
24  Q   Okay.  And she says, "Unfortunately, if I don't
25      get these documents back by end of day
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 93

1       tomorrow, Tuesday, I will need to put your

2       payroll on hold until we resolve any further

3       issues and receive the signed documents."

4            Do you see that?

5   A   Yes.

6   Q   And you had been receiving -- up until this

7       point, you had been receiving your regular

8       paychecks from First Place Bank; is that right?

9   A   As far as I'm aware, yes.

10  Q   And she offers to have a conference with your

11      attorney if there were questions that he or she

12      had, correct?

13  A   Yes.

14  Q   So now if we can go back to Exhibit 15 for a

15      second, there's a document in this same chain,

16      which is now the next day, October 29, another

17      e-mail from Ms. Kuohn to you dated -- or dated

18      October 29th at 1:46 p.m.  Did you see that?

19  A   Yes.

20  Q   And she indicates that she has "not received

21      anything from you yet.  We need to finalize

22      payroll this afternoon and" hoping that you are

23      planning to send your documents yet today.  If

24      not, she needs to stop the payroll process,

25      "payroll payments until we come to a conclusion

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 94

1    on" the agreement.

2         Do you see that?

3    A    Yes.

4    Q    And do you recall any response to her?

5    A    If I did respond, it probably would have been

6         within the agreed upon timeframe of two

7         business days, so I believe the earliest

8         response I would have sent back would probably

9         have been October 30th, if I did.

10   Q    And did you understand from these statements

11        from Ms. Kuohn that she was essentially saying

12        that the bank would no longer negotiate the

13        agreements and would revert back to its

14        position that it was just going to terminate

15        you if you didn't get the documents back?

16   A    When I received it, yes, I would have

17        understood that.

18   Q    And the bank did, in fact, hold your paycheck

19        that was due on November 1st, correct?

20   A    I believe they did, yes.

21                  - - - - -

22             (Plaintiff's Exhibit No. 17 was marked.)

23                  - - - - -

24   Q    All right.  I'm going to show you what has been

25        marked as Exhibit 17.  All right.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 95

1           So if we go to the back of this e-mail

2     chain, you'll see on page 5, it's an e-mail

3     from you to Ms. Kuohn dated November 1, 2013.

4     Do you see that?

5  A  Yes.

6  Q  And the subject is Signed Documents.

7  A  Yes.

8  Q  And you indicate, you're "confirming that the

9     documents are 98% final in our view and close

10    enough to sign."  Did you see that?

11 A  Yes.

12 Q  But at this point, you're in Florida, correct?

13 A  It appears with my reference to my computer

14    equipment being back at my home office in Ohio

15    that, yes, and I believe I reference Florida in

16    the next paragraph.

17 Q  So you're saying that you had no way to

18    basically print them and send them back; is

19    that right?

20 A  Correct.

21 Q  And you also indicate that you had, in fact,

22    communicated with her, correct?

23 A  I said, "I sent you an e-mail and left you a

24    voicemail Monday letting you know that I was

25    still" "in Florida and that I would be in touch

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 96

1      as soon as possible.  "Had I not called and

2      e-mailed," "then your statement would have been

3      valid."

4   Q  And then you indicate that you were unhappy

5      with the bank for holding your paycheck "and

6      the allegations that I would not keep my word

7      and sign the documents."  Do you see that?

8   A  Yes.

9   Q  So at this point, you had essentially

10     committed -- in your mind, you had committed

11     to the bank to sign the documents?

12  A  Yes.

13  Q  And you were unhappy that the bank wouldn't

14     take you at your word that you would do that?

15  A  I state that I was confused, yes.

16  Q  Okay.  And then if we go skip down to the

17     second to last paragraph, you say --

18                MR. WARE:          Bless you.

19                MS. KRAMER:        Thank you.

20  Q  -- if we skip down to the second to last

21     paragraph --

22                MR. WARE:          Bless you

23     again.

24  Q  -- you indicate, "I am open to your suggestions

25     as to how to proceed, keeping in mind that I am

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 97

1      confirming that I am signing the documents."

2   A   Yes.

3   Q   So at this point, in your mind, you committed

4      to the bank to sign the documents that have

5      been submitted to you?

6   A   Yes.

7   Q   And that included the Project Completion

8      Agreement and the -- what we've been calling

9      the Separation Agreement?

10  A   I don't delineate that in my e-mail to her, no.

11  Q   Right.  But in your mind, it would have

12     included those documents?

13                  MS. KRAMER:          Objection.

14  A   I honestly don't recall I mean what all that

15     entails.  If I had spelled it out, I could

16     answer that, but I really don't know.  There

17     was more than one document.

18  Q   Right.  And you don't indicate there's -- "I'm

19     committing I'm signing the documents except for

20     anything else," you say, "I'm signing the

21     documents," correct?

22  A   I don't know that I'm -- everything was

23     100 percent final.  I'd say it was 98 percent

24     final which left -- or clearly communicated in

25     my mind that everything was not 100 percent

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 98

1        final yet, so that is why I probably denoted
2        98 percent final and not 100 percent.
3    Q   But you indicate, "98% final in our view and
4        close enough to sign," correct?
5    A   Yes.
6    Q   And then you repeatedly indicate that you were
7        ready to sign the documents, correct?
8    A   Yes.
9    Q   And you never indicate, "I'm ready to sign all
10       the documents except for the Project Completion
11       Agreement," correct?
12   A   I don't spell that out in this e-mail, no.
13   Q   And, in fact, that was not in your mind; isn't
14       that right?
15                   MS. KRAMER:         Objection.
16       He already testified what was in his mind.
17                   MR. WARE:         No, he
18       didn't.
19   Q   But that was not in your mind, correct?
20   A   I don't recall exactly what was in my mind at
21       that time.
22   Q   You don't recall one way or the other?
23   A   I recall feeling comfortable that I would
24       travel back to sign everything that was deemed
25       final.  Obviously there was some provisions

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 99

1      that I was not okay with that, if not resolved,

2      may or may not have led to my signature of that.

3   Q  But you never indicated that to the bank,

4      correct?

5                    MS. KRAMER:         Objection.

6      You can answer.

7   A  I think through multiple communications, that

8      they have a sense that I was not happy with

9      100 percent of all of the documents.

10  Q  Through multiple communications?

11  A  I think we have established through these

12     e-mails in the back and forth and Talmer saying

13     they don't agree to everything that there was

14     certainly a precedent set that there was not

15     100 percent agreement with the documents.

16  Q  You indicate to the bank on November 1 multiple

17     times that you're ready to sign the documents,

18     correct?

19  A  Yes.

20  Q  And you never indicate that there's anything

21     you're not ready to sign, correct?

22  A  That is correct.

23  Q  And you never ever told the bank that you would

24     not be ready to sign any specific document in

25     the stack that had been given to you?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 100

```
 1   A   That is correct.
 2   Q   Now, if we go up in this e-mail chain, Ms. Kuohn
 3       indicates to you on the same day as your
 4       November 1 e-mail, "Thank you for articulating
 5       your intent to sign the documents.  What day
 6       next week do you plan to sign them?  We will be
 7       available at your convenience to receive and
 8       countersign the documents."
 9           Do you see that?
10   A   Yes.
11   Q   And you indicate you're going to be arriving
12       back Thursday afternoon, but won't have an
13       exact time, correct?
14   A   Correct.
15   Q   You're driving back, right?
16   A   Correct.
17   Q   So then there's another exchange of documents
18       indicating your progress on your drive and it
19       turns out you can't make it to sign the
20       documents on Thursday, November 7th, correct?
21   A   Correct.
22   Q   And if you go to the top of the second page,
23       Ms. Kuohn indicates that she's "sorry for that.
24       We need the signed documents tomorrow or we
25       will be terminating you at the end of the day.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 101

1        Unfortunately, we cannot wait any longer.

2        Please let me know what time you plan to bring

3        the documents to the bank.  I will let you know

4        who is available to meet you."

5               Do you see that?

6   A    Yes.

7   Q    And your response is, "I would like to meet

8        after lunch.  If the Bank can have two hard

9        copies of the documents ready to sign, I would

10       be greatly appreciative."

11              Do you see that?

12  A    Yes.

13  Q    So you asked for them to actually print out the

14       documents, have them ready, right?

15  A    Yes.

16  Q    Never asked for any changes, correct?

17                  MS. KRAMER:          Objection.

18       You can answer.

19  A    No new changes, no.

20  Q    No new changes, correct?

21  A    Correct.

22  Q    And Ms. Kuohn suggests 1:30 p.m., correct?

23  A    Yes.  She says, "How about 1:30?".

24                  - - - - -

25              (Plaintiff's Exhibits Nos. 18 and 19 were

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 102

```
 1      marked.)

 2                    - - - - -

 3  Q   All right.  I'm handing you, Mr. Kausmeyer,

 4      what's marked Exhibits 18 and 19.  And these

 5      are the signed copies of the Project Completion

 6      Agreement and the Separation Agreement that you

 7      signed when you came to the bank on

 8      November 8th; is that right?

 9  A   That is correct.

10  Q   And I take it, as you requested, the bank had

11      copies printed out and ready for you to sign

12      when you got there; is that right?

13  A   I know they had at least this copy, yes.

14  Q   And you signed the documents and you took

15      signed copies with you, correct?

16  A   Yes.

17  Q   And the documents we've marked are documents

18      that came from your file, so you've retained

19      copies of these in your files, correct?

20  A   Yes.

21  Q   And who was at the bank when you came on the

22      afternoon of November 8th?

23  A   David Wolfe and Karen Tomlinson.

24  Q   And who met you when you arrived?

25  A   That I don't recall.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 103

1    Q    And I take it you were taken into an office

2         with the documents?

3    A    I would have been buzzed in through the front

4         door and then I would have walked into the

5         human resource office on the first floor.

6    Q    And you met only with Mr. Wolfe and

7         Ms. Tomlinson; is that right?

8    A    As far as I can remember, those were the two

9         key individuals that I can remember were there,

10        yes.

11   Q    You can't remember anyone else who was there?

12   A    I -- yeah.  I had thought Ms. Kuohn was there,

13        but I may have compounded that with an earlier

14        meeting in September.  I'm not 100 percent sure.

15   Q    And do you recall any discussion that you had

16        with the folks at First Place Bank when you had

17        this meeting to sign the documents on November

18        8th?

19   A    Yes.

20   Q    And what was that discussion?

21   A    Regarding the Project Completion, we had the

22        note -- I had noted that, because of the date,

23        I had requested that an updated copy be made,

24        that the document as it sat was null and void,

25        and I was told that we don't need to re-date

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 104

1       it, we don't need to re-update it, and that I

2       could just go ahead and sign for regulatory

3       purposes, and that I did not need to date this

4       document as I had already previously dated the

5       Separation Agreement November 8.

6    Q  Okay.  Anything else do you recall indicating?

7    A  There's probably some discussion as to why or

8       why not the documents would not be updated, and,

9       you know, certainly the payments that were made

10      for my Termination for Good Cause in July were

11      represented as could have -- could be golden

12      parachute payments which would be direct

13      violation of the consent order, so we were

14      hoping to avoid a violation of the law.

15           Whether that applied to me, I don't know,

16      but certainly knowing that the OCC would be

17      involved in my future employment, I certainly

18      did not want to do anything that would take me

19      out of consideration for approval for future

20      employment, nor did I want to do any harm to

21      the bank.

22   Q  I just want to focus on what was said at the

23      meeting, okay, and we'll talk about what your

24      thought process is.

25   A  What was said at the meeting is that this

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 105

1      document was for regulatory purposes and that's

2      why we did not need a November 8 date, that's

3      why we didn't need to extend the deadline to

4      November 8, because I had noted that the

5      deadline has passed and this document is null

6      and void.

7   Q  So your testimony is, you said that the date

8      needed to be updated?

9   A  If the intent was for this to be a legally

10     binding document, yes.

11  Q  Did you use the term "if the intent was to be a

12     legally binding document"?

13  A  I believe I would have said that because I did

14     note that this has passed and that this is a

15     null and void agreement.

16  Q  Okay.  And don't tell me what you believe you

17     would have said.  I just want to know what you

18     recall being said.

19  A  I didn't record the meeting.  I don't know if

20     First Place recorded the meeting, but that

21     would have been the subject of the discussion.

22  Q  So you indicated that the Project Completion

23     Agreement, which is Exhibit 18, didn't have an

24     updated date, and you're referring to the date

25     on page 3, correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 106

1   A   Page 1 and page 3, yes.

2   Q   Page 1 and page 3.

3           The date on page 1 being the date of the

4       letter?

5   A   Correct.

6   Q   So you wanted the date of the letter to

7       reflect --

8   A   November 8th.

9   Q   -- November 8th, and also the date on the

10      deadline paragraph, which is the last

11      paragraph, to also say November 8th, correct?

12  A   Correct.

13  Q   And you noted that the dates would be updated.

14      You were told they were not going to be updated

15      and you should go ahead and sign them?

16  A   Without dating and that this was for regulatory

17      purposes only.

18  Q   So when you said -- who told you that it was

19      for regulatory purposes only?

20  A   Mr. Wolfe.

21  Q   That there was only -- did he indicate anything

22      else to you about what regulatory purposes only

23      meant?

24  A   No.  No.

25  Q   So you said, "It doesn't have the right dates.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 107

1    We need to update it," Mr. Wolfe said, "It's

2    for regulatory purposes only."  At that point,

3    did you go ahead and sign it?

4  A  I asked if I needed to date the signatures

5    because I had previously executed the

6    Separation Agreement and dated it, and I said,

7    "Well, if I do sign this, there's no line for a

8    date, and I was told 'Do not date it.'"

9  Q  And so you were told not to put a date down,

10    and at that point, did you sign it?

11  A  Yes.  Yes, believing.

12  Q  Was there any other discussion that you had

13    with Mr. Wolfe concerning the signing of the

14    Project Completion Agreement?

15  A  I believe after I executed it, there was copies

16    made and there wasn't any other communication

17    other than the company cell phone that I had

18    retained but I believe did not work for whatever

19    reason.  I did need to return that, so I do

20    believe I exited the building, returned to my

21    vehicle, retrieved the phone and then brought

22    it in to Karen Tomlinson afterwards.

23  Q  Okay.

24  A  Because there was a clause somewhere about

25    returning bank equipment, so I complied with

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 108

1      all of that.

2  Q   Did you have any discussion with anyone,

3      including Ms. Tomlinson or Mr. Wolfe, about the

4      Project Completion Agreement on November 8th

5      other than what you've just testified to?

6  A   I don't believe there was any further

7      discussion, no.

8  Q   And I take it there was no discussion that you

9      had leading up to when you arrived at the bank

10     either?  You hadn't talked by phone or anything?

11 A   I called somebody to let me in, so, obviously,

12     I spoke with somebody.

13 Q   Right, but concerning the Project Completion

14     Agreement --

15 A   No.

16 Q   -- the only discussion is what you've testified?

17 A   No documents were discussed in detail.  It was

18     a formality of signing with the comments that we

19     already discussed in regards to this Project

20     Completion Agreement.

21 Q   And did you understand that you were entering

22     into the Project Completion Agreement when you

23     signed it on November 8th?

24              MS. KRAMER:         Objection.

25 A   Not sure.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 109

```
 1   Q   What's that?

 2             MS. KRAMER:        You can go

 3       ahead and answer if you understand the question.

 4   A   Oh, I don't understand the question.

 5   Q   Well, let me ask you this:  At the time you

 6       signed the Project Completion Agreement on

 7       November 8th while you're sitting in the

 8       offices, did you expect that you would be

 9       receiving the $26,666?

10   A   At the time of this agreement, I signed it I

11       believe for regulatory purposes.  I did not

12       know for sure, because of all the events

13       leading up to this, that that was, in fact,

14       going to happen or not.  There was -- I did

15       have doubts, yes.

16   Q   You had doubts, but did you believe that it was

17       possible you're still going to receive that

18       bonus?

19   A   As a possibility, yes.

20   Q   And it had indicated on the first page that one

21       of the requirements that you had was to remain

22       employed through November 8th, 2013.  Do you

23       see that?

24   A   Third paragraph, yes.

25   Q   And did you believe at this point that you had
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 110

1      met all of your obligations under the Project

2      Completion Agreement?

3  A   Well, I believed the agreement was prospective,

4      because you can't contract for past activities,

5      so essentially, you know, this next paragraph

6      on the following conditions would have been for

7      November 8th forward.

8  Q   Okay.  Did you believe you met your obligations?

9  A   Well, the obligations were going to start after

10     that date, so that would have been --

11 Q   Oh, understood.

12 A   -- the following.

13 Q   Up until the point that your employment was

14     terminated, do you believe you met your

15     obligations?

16 A   In July, yes.  I terminated for good cause in

17     July, and up until that point, yes, I do

18     believe I met all of my requirements of my

19     employment.

20 Q   And I'm talking about the Project Completion

21     Agreement which you understood that your

22     employment wasn't formally terminated in July,

23     correct?

24 A   I formally terminated it in July.

25 Q   You gave the notice, correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 111

1   A   Yes, yes.

2   Q   But you continued to be paid, right?

3   A   The Change in Control called for, in the event

4       of a dispute, that the paychecks would continue

5       until such dispute is resolved.  That's clearly

6       denoted.

7                    MS. KRAMER:        I'm going to

8       ask right now to take a break.  I think that --

9       well, we've been going for an hour and I'd like

10      Mr. Kausmeyer to review these.

11                   MR. WARE:          To review

12      what?

13                   MS. KRAMER:        You're asking

14      him a lot of very specific questions about

15      these two exhibits, so I would like him to take

16      a few minutes to read them from beginning to

17      end.

18                   MR. WARE:          Okay.  Well,

19      I mean you can do that as we sit here.  That's

20      fine.

21                   MS. KRAMER:        Okay.

22   Q   Do you need to read it?

23   A   Yes, I think that's good.  I could also use a

24      restroom break as well.

25   Q   Well, I'll tell you what:  Why don't you take a

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 112

```
 1      look at the Project Completion Agreement?  I
 2      really don't have many questions about the
 3      Separation Agreement.  You can read that later.
 4      But if there's anything you need to read to
 5      answer any questions that I have, why don't you
 6      go ahead and we can finish this?
 7                  MS. KRAMER:      I'm sorry.
 8      Finish the deposition or finish your
 9      questioning?
10                  MR. WARE:      Finish my
11      questions on this.
12  A   Yeah.  I mean I could read it now.
13                  MS. KRAMER:      Yes.
14  Q   Yes.  Go ahead.
15                  (Short pause.)
16                  THE WITNESS:      Is there a
17      way we can redact that?
18                  MS. KRAMER:      I'm sorry?
19                  THE WITNESS:      Is there a
20      way I can have that redacted?
21                  MS. KRAMER:      Well, we've
22      already produced that.  We've already produced
23      it.  We'll talk about it afterwards.
24                  (Short pause.)
25  A   Okay.
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 113

```
 1   Q   So we were talking about, my question, overall
 2       question to you was whether you felt that you
 3       met the obligations of the Project Completion
 4       Agreement, which is Exhibit 18, the conditions
 5       that were stated in here for payment of the
 6       Project Completion bonus.
 7   A   So those conditions would have come into effect
 8       on November 8th, and those conditions would
 9       have had to have been met going forward because
10       you can't contract for past work.
11   Q   Regardless of when you think they began, I
12       don't mean to contradict you on that, I'm just
13       asking you --
14   A   Well, starting on November 8th, all of these
15       would have been met starting on November 8th.
16   Q   So they would have been met by you starting
17       November 8th?
18   A   Yes.
19   Q   And I had asked you earlier whether as you
20       signed this document on November 8th you
21       believed you would be entitled to the Project
22       Completion bonus and I think you indicated you
23       weren't sure.  Did you ever form a belief after
24       November 8th that you should be entitled to the
25       Project Completion bonus?
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 114

```
 1   A   There was -- I mean just from a factual
 2       standpoint, there was money deposited and
 3       removed from my bank account on or about the
 4       time that this would have been eligible for
 5       payment.  At that point, you have a debit and
 6       then reversed out.  I believe that that took
 7       care of whatever would have stemmed from this
 8       Project Agreement, that it was over.
 9            And so in my mind at that point, I
10       believed, you know, this Project Completion,
11       you know, any one of these conditions they can
12       pull back, and they did.  They took it out of
13       my account.  And then it was I believe within
14       the next two weeks that another payment came in
15       which I had believed were finally the expenses
16       I had been waiting on this whole time.
17   Q   That was the exact same amount as the amount
18       that had been previously paid?
19   A   As it turns out, looking at it now, yes, there
20       was.  At the time, there was no aha moment, "Oh,
21       yes, it was the exact same," you know, "amount
22       paid."  You're expecting a payment; you received
23       it.  That was the extent of the -- you know, of
24       what I looked at.
25   Q   After you left First Place Bank's offices on
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 115

```
 1       November 8th, did you have any communications
 2       with anyone from First Place Bank or Talmer
 3       Bank and Trust regarding your Project
 4       Completion Agreement at any point in time?
 5   A   I sought new counsel at that point and that's --
 6   Q   I'm only asking you about communications with
 7       First Place Bank.  Did you have any
 8       communications?
 9   A   I believe in this period, I was prohibited from
10       speaking with anybody other than Rob, Sandy,
11       Tim or Tom, and I don't recall receiving any
12       communications from those four individuals.
13   Q   Regardless of whether you were prohibited or
14       not, I just want to ask you broadly, did you
15       initiate any communications, receive any
16       communications, have any communications of any
17       kind with anyone at First Place Bank or Talmer
18       after November 8th of 2013 regarding your
19       Project Completion Agreement?
20   A   I don't recall.  I really don't recall.
21   Q   You don't recall any such communications?
22   A   Via e-mail, phone.  I mean the bank had my
23       phone, so, you know, and all the records that
24       go with it, but I don't recall anybody who was
25       with First Place Bank reaching out about
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 116

1      services during that time.

2    Q   And the same question, only broader.  After

3      you left First Place Bank's premises on

4      November 8th, 2013, do you recall any

5      communications with anyone from First Place

6      Bank or Talmer on any topic?

7    A   In what time period?

8    Q   Any time after November 8th, 2013.

9    A   Well, yes.  I have kept in touch with some

10      folks, absolutely.

11    Q   Okay.  Who have you talked to?

12    A   Spoken with?

13    Q   Communicated with in any way.

14    A   I mean there's a number of First Place Bank

15      employees on my LinkedIn profile, so there was

16      communication sent post-employment to, you

17      know, establish LinkedIn connections.  I can

18      produce that list.  But, you know, no one

19      person, you know, jumps out as, you know, a

20      favored contact or employee or anything like

21      that.

22    Q   These would have all been either social or

23      professional general communications that you

24      would have had?

25    A   I try to keep most everything professional,

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 117

```
 1      yes.
 2   Q  Yes.  I meant in terms of relating to your
 3      profession.
 4   A  I don't understand what you mean.
 5   Q  I meant the communications that you would have
 6      had with people from First Place Bank or Talmer
 7      would have been general social communications
 8      or communications relating generally to your
 9      professional activities, like Linked In; is
10      that right?
11   A  I think that's a fair statement.
12   Q  Did you have any communications with anyone
13      from First Place Bank or Talmer after
14      November 8th of 2013 regarding your expenses or
15      any other obligation that you believe the bank
16      may have had to you?
17   A  The -- a payment made in late November of '13,
18      two weeks later, I believe was the approved
19      expenses, and I wasn't going to fight -- you
20      know, if that's all that was approved, that's --
21      you know, I just received that payment, which I
22      believe was a reimbursement, and just said,
23      "Fine," you know, "It is what it is at this
24      point."
25            So I did not make or initiate any contact
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 118

1       to any First Place Bank employee or Talmer in

2       regards to that.

3   Q   Or in regards to anything else relating to your

4       expenses; is that right?

5   A   To my expenses, no.

6   Q   And you didn't have any communication with

7       anybody from Talmer or First Place Bank

8       regarding anything relating to the Project

9       Completion Agreement or the Separation

10      Agreement and General Release after

11      November 8th of 2013?

12  A   At some point in the future, yes, I believe

13      this did come up in casual conversation, but

14      this was probably post-employment, so I can't

15      recall exactly when.  It's been a number of

16      years, so.

17  Q   And was this in connection with a demand you

18      were making or something?

19  A   No, no, I wasn't making any demands of the

20      bank.

21  Q   Do you recall who this casual communication was

22      with?

23  A   I spoke with Bill Chernock.

24  Q   About his claim against the bank?

25  A   I was told to seek counsel, you know, different

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 119

1      counsel, that there may be --

2                     MS. KRAMER:          Objection.

3      Please --

4   A   Yeah.  I --

5                     MS. KRAMER:          -- to the

6      extent you can answer without revealing any

7      attorney-client communications.

8   A   Yeah.  He just pointed me in a different

9      direction.  That's all.

10  Q   Mr. Chernock did?

11  A   Yes.

12  Q   What direction did he point you in?

13  A   To seek a different law firm.

14  Q   That would be Ms. Kramer's firm?

15  A   Yes.

16  Q   And that would have happened very shortly after

17     you left the offices on November 8th?

18  A   I don't recall if it was shortly after or at

19     some point prior to the next week.

20  Q   All right.  Well, we're getting beyond the

21     Project Completion Agreement, so we'll take our

22     break.

23                     THE VIDEOGRAPHER:    Off the

24     record.  The time is 12:20.

25                     - - - - -

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 120

1           (Thereupon, a luncheon recess was taken

2        from 12:20 p.m. until 1:03 p.m.)

3                  - - - - -

4                  THE VIDEOGRAPHER:   We're back on

5        the record.  The time is 1:03.

6                  - - - - -

7           (Plaintiff's Exhibit No. 20 was marked.)

8                  - - - - -

9        CONTINUED EXAMINATION OF GARY KAUSMEYER

10   BY MR. WARE:

11   Q   All right.  Mr. Kausmeyer, we were talking

12        before our break about the payments that you

13        received from First Place Bank in November of

14        2013.

15           I want to hand you what's been marked as

16        Exhibit 20 which is a Compensation Report from

17        First Place Bank indicating the payments in the

18        bank's records to you during the year 2013, and

19        I want to refer you to the second to -- excuse

20        me -- the third to last page which has Talmer

21        868 at the bottom.  And can you see that each

22        of the entries here has a date next to it?  You

23        see September 20 of 2013 near the top?

24   A   Yes.

25   Q   And at the very bottom, there's an entry

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 121

1        November 1, 2013.  Do you see that?

2    A   Yes.

3    Q   And that indicates all zeroes, correct?

4    A   Except for my employee number and the hours,

5        yes.

6    Q   Right.  In terms of the amounts that you would

7        have received, that's indicated as zero,

8        correct?

9    A   Correct.

10   Q   And that would be consistent with your

11       recollection that you did not receive your pay

12       on November 1st, 2013, correct?

13                  MS. KRAMER:         Objection.

14       You can answer.

15   A   Correct.

16   Q   And if you'd go to the next page, you'll see

17       three entries dated November 15, 2013.  Do you

18       see that?

19   A   Yes.

20   Q   Okay.  And then, so the first --

21   A   Actually, I see four.  One, two, three, four.

22   Q   Yes.  Correct.  Excuse me.  Four entries dated

23       November 15.  And I want to refer to the first

24       three for now.

25               The first one indicates Bonus and it's

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 122

1           26,666.  Do you see that?

2    A      Yes.

3    Q      And then the next two are Regular Earnings, and

4           the number on the top of the Gross Earnings

5           column is $5,827.03.  Do you see that?

6    A      Yes.

7    Q      And then just below that, there's an entry

8           dated November 15, 2013, negative 26,666.  Do

9           you see that?

10   A      Yes.

11   Q      So that would be consistent with your

12          recollection that that money was deposited and

13          then taken out of your account, correct?

14   A      Correct.

15   Q      And then there is an entry on November 29, 2013

16          for the same amount, 26,666, correct?

17   A      Correct.

18   Q      All right.  And if we look in toward the right,

19          in the second to last column on the right, the

20          bottom of that column, the entries for Bonus

21          all have the, next to the words Checking (Net),

22          $19,079.52, correct?

23   A      Correct.

24   Q      And that would be consistent with your

25          recollection of what was deposited, reversed

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 123

```
 1      out, and then again deposited into your account

 2      in November of 2013?

 3   A  Correct.

 4   Q  Okay.  If you look at the next entry below

 5      that -- and let me just, to be clear, you don't

 6      recall receiving any payments of any kind from

 7      First Place Bank or Talmer after you received

 8      that $19,079.52 deposit in your account in

 9      November of 2013?

10   A  That would be incorrect.

11   Q  Oh, you did receive other payments?

12   A  Yes.

13   Q  What did you receive?

14   A  There was a deposit made in January for a few

15      thousand dollars and that was promptly reversed

16      out at that time as well, as exactly the same

17      way that this amount here for the 19,000 were

18      put in and taken back out.

19   Q  So there was an amount paid and reversed out in

20      January.  Do you recall what that amount was?

21   A  I don't recall, but we can produce the amount.

22   Q  All right.

23   A  Actually, if you have a report like this, you

24      should have something for January as well.

25   Q  Okay.  In January -- the report we're looking
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 124

1    at is only for 2013, so your testimony is that

2    came in 2014; is that correct?

3  A  That's correct.

4  Q  So if you look at the -- well, let me -- just

5    to be clear, you didn't receive any other

6    payments or reversals from First Place Bank

7    other than what we've talked about with respect

8    to November of 2013 and in January of 2014?

9  A  That would be correct.

10 Q  All right.  So the last entry on Exhibit 20 on

11   the last page are the Employee Totals.  Do you

12   see that?

13 A  Yes.

14 Q  And do you see the number at the top 161,578.40?

15   Do you see that?

16 A  Yes.

17 Q  And below that, do you see that encompasses the

18   26,666 number?

19 A  Yes.

20 Q  And it's correct that your regular salary

21   stopped as of November 15, 2013?  You didn't

22   receive any of those payments after that point?

23 A  That would be correct.

24 Q  So you would not have expected to receive the

25   full $160,000 salary for 2013?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 125

1   A    This would be the first that I would be

2        thinking about it, but based on the footing of

3        the totals, that amount was, in fact, there,

4        but, again, that this was for fiscal year end

5        of 2013.

6   Q    For calendar year end 2013?

7   A    Correct.  And that, per my offer letter, there

8        were -- there was mention of tax consequences

9        of any reimbursements, and so I believed that

10       my ending salary included reimbursements that

11       were noted in my offer letter as having tax

12       consequences to them, so I did not find that to

13       be unusual.

14  Q    You did not find -- I think you're skipping

15       ahead to what I'm asking you about, because you

16       didn't receive this report, correct?

17  A    No, I did not.  This is the first time.

18  Q    Yes.  You haven't seen this, correct?

19  A    Correct.

20  Q    Okay.  So let's wait for that testimony until I

21       actually ask you the questions here.

22                      - - - - -

23           (Plaintiff's Exhibit No. 21 was marked.)

24                      - - - - -

25  Q    Take a look at Exhibit 21, and this is a copy

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 126

1       of your W-2 statement for 2013, correct?

2   A   That's what it says here, yes.

3   Q   And you would have received a W-2 from First

4       Place Bank for the year 2013?

5   A   They should have sent one, yes.

6   Q   And you recall that they did send one?

7   A   I don't recall specifically seeing anything in

8       the mail, but I assume they sent it.

9   Q   Well, you submitted your taxes, correct?

10  A   Yes.

11  Q   And so you had to have that number to submit

12      your taxes, correct?

13  A   Through TurboTax, you don't need to have this

14      physical hard copy, no.

15  Q   But you have to receive the number, correct?

16  A   It does it for you.

17  Q   It comes up with a number for you, what your

18      wages are?

19  A   Yeah.  If you said, "Do you still work there?",

20      "Yes," and it will automatically import all of

21      that information.

22  Q   Import it from where?

23  A   From wherever TurboTax gets its information

24      from.  I can't testify as to how TurboTax does

25      that.  All I know is that when you go to file,

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 127

1       you give them an employer ID, and then from

2       that employer ID and your employee number, it

3       pulls in that information.

4   Q   Oh, okay.  All right.  So it connects with

5       the -- your understanding is it connects with

6       the employer's financial system?

7   A   If I recall correctly, yes.  I've worked at a

8       few banks over the years, so that is typically

9       how I file my taxes.

10  Q   Okay.

11              MS. KRAMER:        And I'm

12      just -- this is something I assume that Talmer

13      just sent over to us yesterday.  It has Gary's

14      Social Security number on it, and I know it's

15      subject to the protective order, but I would

16      appreciate it if we could redact this.  I don't

17      want this used as a Deposition Exhibit with his

18      Social Security number sitting on it like this.

19              MR. WARE:          Yes, we can

20      redact it.

21              MS. KRAMER:        Thank you.

22              MR. WARE:          That's fine.

23      I mean it --- okay.  Yes, it's redacted.  These

24      are documents you produced anyway.  It's

25      redacted from the tax returns.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 128

1    BY MR. WARE:

2    Q    So your W-2 from First Place Bank indicates the

3         same number that we just looked at in the

4         Compensation Report for in terms of total

5         wages, right?  161,578.40, correct?

6    A    Correct.

7    Q    All right.  And --

8                    MS. KRAMER:        It's actually

9         161,578.

10   Q    Oh, I apologize.  I misspoke.

11              161,578.40, correct?

12   A    Yes.

13                    - - - - -

14              (Plaintiff's Exhibit No. 22 was marked.)

15                    - - - - -

16   Q    Now take a look at Exhibit 22.

17                    MS. KRAMER:        Just, I'm

18        going to follow through with what I just

19        objected to, because could we please have these

20        shredded and --

21                    MR. WARE:        Well, why

22        don't I just redact it?  I'll put something

23        over it and I'll make a copy.

24                    MS. KRAMER:        Okay.  Thank

25        you.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 129

```
 1                    THE VIDEOGRAPHER:    Excuse me,
 2        Mr. Ware.  Could we go off the record for a
 3        moment?
 4                        MR. WARE:        Sure.
 5                    THE VIDEOGRAPHER:   The time is
 6        1:13.
 7                    (Short break taken.)
 8                    THE VIDEOGRAPHER:   Back on the
 9        record.  The time is 1:16.
10   BY MR. WARE:
11   Q    All right.  I gave you a copy of Exhibit 22; is
12        that correct?
13   A    Yes.
14   Q    And that's the copy of your tax return for --
15        your income tax return for the year 2013,
16        correct?
17   A    Correct.
18   Q    And you have indicated your wages at $161,578,
19        correct?
20   A    Correct.
21   Q    The same amount that's reflected in the W-2,
22        correct?
23   A    Correct.
24   Q    The same amount that's reflected in the
25        Compensation Report, correct?
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 130

1    A    Correct.

2    Q    And as indicated in the Compensation Report,

3         that includes the $26,666 payment you received

4         from First Place Bank?

5    A    As I saw it today, yes.

6    Q    And you indicated, I think you testified

7         earlier that when you saw this number, which

8         was actually above what you would have received

9         for a full year of 2013, even though you didn't

10        work for a full year, you simply thought -- you

11        didn't think about it at that time?

12   A    Well, I expected that there would have been tax

13        consequences to whatever was reimbursed per the

14        offer letter because it clearly stated in the

15        offer letter there would be tax consequences.

16   Q    So you did -- at that time, you thought, hmm,

17        this is more than I made in compensation, but

18        it was probably included in my reimbursement

19        which had tax consequences?

20   A    Correct.

21   Q    And you didn't think to see whether you could

22        deduct those reimbursable expenses?

23                  MS. KRAMER:          Objection.

24                  THE WITNESS:         I answer the

25        questions?

Deposition of Gary Kausmeyer , taken January 20, 2016

1              MR. WARE:         I mean

2     you keep making objections.  There is no

3     objectionable statement there.

4              MS. KRAMER:         Well, you

5     know what?  I'm not making speaking objections,

6     but you're assuming -- a lot of your questions,

7     Rob, are assuming facts that he hasn't testified

8     to.  So if you want to start asking more

9     clearly-worded questions, that would be fine,

10    but I would say a good 25 percent of what

11    you're asking, you're assuming things that

12    aren't already in evidence.

13              MR. WARE:         Okay.

14 Q  You did not think about considering whether

15    there would be a way that you could deduct the

16    $19,000 you believed you had received in

17    expense reimbursements?

18 A  I answered the questions as TurboTax presented

19    them.

20 Q  And what do you mean by that?

21 A  From A to Z, whatever question came up, I

22    answered truthfully, and whatever it spit out

23    is what spit out.  That was the extent of my

24    tax preparation.

25 Q  But you did consider that the reimbursable

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 132

1    expenses -- the reimbursed expenses that you

2    believed you had received were a part of the

3    $161,000?

4  A  Whatever amounts that the bank should report I

5    believe were included.  I did not challenge the

6    $161,578 number.

7  Q  Okay.  Turn to page Kausmeyer 269.  So if you

8    go to the top, this is a Schedule A worksheet,

9    and you go to the top, you did indicate that

10   you had deductible expenses, business expenses

11   of $2,933.  Do you see that?

12 A  Yes.

13 Q  Do you know what those were?

14 A  Whatever TurboTax asked, I input it, and that's

15   the number that came out.  I don't know what

16   comprises that number.

17 Q  And you had to have some source for that,

18   correct?

19 A  Correct.

20 Q  And do you know what that was?

21 A  I do not.

22 Q  And you don't know what, in general terms, what

23   made up those business expenses?

24 A  I do not.

25 Q  And would you have documentation to support

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 133

1      those currently?

2   A  I'm sure I do, yes.

3   Q  And that same page also indicates attorney and

4      accounting fees of $1,280.  Were those your

5      attorney fees from associated with the

6      negotiation of the agreements around your

7      termination of employment?

8   A  A part of that would have been included, yes.

9   Q  I'm sorry.  A part of those fees included --

10  A  A part of the 1280 did include attorneys' fees.

11  Q  And there were other fees than the 1280?

12  A  Well, it says accounting fees, so I'm assuming

13     that TurboTax would include the money spent on

14     TurboTax from the prior year in that total.

15  Q  But other than that, it would have been

16     attorneys' fees?

17  A  Correct.

18                MS. KRAMER:        Can you

19     please pull Exhibit 21 out of there?

20                MR. WARE:        Sure.

21                MS. KRAMER:        Thank you.

22                - - - - -

23        (Plaintiff's Exhibits Nos. 23 and 24 were

24     marked.)

25                - - - - -

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 134

1   Q   All right.  So I'm going to hand you a copy of

2       Exhibits 23 and 24, and these are two of the

3       bank statements you produced to us; is that

4       correct?

5   A   Yes.

6   Q   This is your account with Bank of America; is

7       that right?

8   A   Yes.

9   Q   And if you turn to page 3 of Exhibit 23,

10      there's two indications of a $19,079.52

11      payment.  Do you see that?

12  A   Yes.

13  Q   One of them is entitled Return of Posted Check.

14      Do you see that?

15  A   Yes.

16  Q   But they're both in the list of Deposits and

17      Other Additions.  Is there anywhere that

18      indicates that the second payment is a

19      deduction?

20  A   I can't speak to how Bank of America puts

21      together their bank statements.

22  Q   There's a separate -- on the next page, if you

23      look, it's all redacted, but there's a separate

24      section for Withdrawals and Subtractions,

25      correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 135

1   A    Part of that was in the redacted portion, yes.

2                    MS. KRAMER:        And my

3        apologies.  I had a paralegal do the redactions

4        and she redacted the -- there is another entry

5        on November 15th of 2000 -- I'm sorry --

6        November 19th of 2013 showing a withdrawal of

7        $19,079.52 from this account.  I will go back

8        and correct that this afternoon or first thing

9        tomorrow.

10                   MR. WARE:          Okay.

11                   MS. KRAMER:        So if you

12       would take a look at page 4 of 6, in this

13       Amount column under Withdrawals, there's an

14       indication that on November 19th, 2013, there

15       was a withdrawal of that amount.

16                   MR. WARE:          Okay.

17                   MS. KRAMER:        My apologies.

18                   MR. WARE:          Okay.  That's

19       fine.  Is there a -- there's a redaction

20       immediately above 11-20 -- the item for

21       11-20-13.  Is that redaction a separate item

22       or is that a heading?

23                   MS. KRAMER:        I don't

24       recall, but it had nothing to do with First

25       Place Bank.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 136

1                    MR. WARE:          Okay.  I

2      guess I'm just curious if there was a separate

3      heading that got redacted out that wouldn't

4      be -- obviously I don't have any interest in

5      actual deposits that don't have to do with

6      First Place Bank, but I think it's the heading

7      I would be interested in.

8                    THE WITNESS:         I think based

9      on the format with the lines, there's no

10     headings that would occur within the lines, so

11     I think that's just an extra line.

12                   MR. WARE:          Okay.  All

13     right.

14                   THE WITNESS:         I don't see

15     these in paper that often, so.

16                   MR. WARE:          Got it.

17     Okay.  Yes.  So if you could produce the

18     unredacted --

19                   MS. KRAMER:         Yes.  My

20     apologies.  I didn't realize the whole page got

21     redacted.

22  BY MR. WARE:

23  Q   All right.  And take a quick look at Exhibit 24.

24     Page 3 reflects the deposit you testified about

25     earlier of the $19,079.52, correct?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 137

1    A    Correct.

2    Q    And that remained in your account, correct?

3    A    That remained in my account, yes.

4                    - - - - -

5         (Plaintiff's Exhibit No. 25 was marked.)

6                    - - - - -

7    Q    I'm going to show you Exhibit 25.  You've seen

8         this document before I take it?

9    A    Yes.

10   Q    And this is a letter sent by your attorney on

11        November 15, 2013 to First Place Bank revoking

12        the Separation Agreement and General Release

13        that you had signed on November 8th, correct?

14   A    Correct.

15   Q    And I take it you had authorized your counsel

16        to send this letter?

17                   MS. KRAMER:          Objection.

18        You could answer.

19   A    Yes.

20                   - - - - -

21        (Plaintiff's Exhibit No. 26 was marked.)

22                   - - - - -

23   Q    I'm going to show you Exhibit 26, and this is

24        another faxed letter from your counsel to First

25        Place Bank.  Do you see that?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 138

1   A   Yes.

2   Q   And it was sent a couple of hours after the

3       first one we looked at, Exhibit 25, correct?

4   A   The time stamp here is 12:58 p.m. and the time

5       stamp on the prior one is 12:07 p.m., so 51

6       minutes later, yes.

7   Q   Oh, I see.  You're looking at the bottom.  I

8       got it.  Okay.  I was looking at the time at

9       the top.

10           And the second letter, Exhibit 26, is a

11      Revised Revocation.  Do you see that?

12  A   Where does it say Revised -- yes.

13  Q   In the subject.

14  A   Yes, yes.

15  Q   And the only revision is that, from the first

16      letter is, rather than referring to your

17      former employment, it indicates that it is

18      representing -- that the law firm is

19      representing you with respect to your

20      employment, your current employment.  Do you

21      see that?

22  A   Yes.

23  Q   And do you know why that change was made?

24                  MS. KRAMER:          Objection.

25  A   That's counsel -- yeah.  I can't speak on

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 139

 1      behalf of counsel, so.

 2  Q   Is it consistent with your understanding that

 3      you were employed by First Place Bank?

 4              MS. KRAMER:          Objection.

 5      I'm going to instruct him not to answer.

 6  Q   I'm not asking for communication with counsel

 7      that you had.  I'm asking for your

 8      understanding of whether you were employed by

 9      First Place Bank.

10  A   My understanding was as murky as both of these

11      documents, because I had terminated my

12      employment in July of '15 -- or, I'm sorry,

13      July 15th of 2013, this is November 15th of

14      2013, and I think the murkiness is shown in

15      this communication.

16  Q   And you were copied on this as indicated here,

17      correct, by e-mail?

18  A   Via e-mail, yes.

19  Q   And so you were aware that your counsel changed

20      the original letter from former employment to

21      employment?

22  A   I don't know when I received both e-mails, but,

23      obviously, being sent fairly close together, it

24      was probably at the same time.  I can't -- I

25      can't recall when I would have checked my

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 140

```
 1      e-mail for either one of these documents.
 2   Q  Yes.  I didn't ask you when you checked your
 3      e-mail.  I just said you were aware that this
 4      revocation --
 5   A  At whatever time I checked.
 6   Q  -- at least amended that category.
 7   A  At whatever I checked, yes.
 8   Q  Whenever you checked it, you became aware of
 9      that?
10   A  Yes.
11   Q  And did you have any communications yourself
12      with anyone at First Place Bank or Talmer about
13      your revocation of the Separation Agreement and
14      General Release?
15   A  I left that to counsel to communicate.
16   Q  So your answer is no, you did not have those
17      communications?
18   A  No, I personally did not.
19   Q  And why did you revoke your Separation
20      Agreement and General Release?
21                  MS. KRAMER:        Objection.
22      I'm just going to instruct him not to answer.
23                  MR. WARE:          I'm not
24      entitled to know why he did it?
25                  MS. KRAMER:        Clearly he's
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 141

1       talking to an attorney and he asks an attorney

2       to revoke it.

3   Q   I'm not asking what you discussed with your

4       attorney or any advice you got from your

5       attorney.  I'm asking you why did you revoke

6       this agreement.

7   A   On counsel's advice.

8   Q   And this is counsel you engaged after you

9       signed the agreement; is that right?

10  A   I don't recall exactly when.

11  Q   I'm sorry?

12  A   I don't recall exactly when.

13  Q   You don't recall if you engaged counsel before

14      you signed the agreement or after?

15  A   I don't recall.

16                  - - - - -

17          (Plaintiff's Exhibit No. 27 was marked.)

18                  - - - - -

19  Q   I hand you what's been marked as Exhibit 27,

20      and this is a letter from Mr. Wolfe at First

21      Place Bank to your counsel, Mr. Cohen.  Do you

22      recall seeing a copy of this letter at some

23      point on or after November 19th?

24  A   After November 19th, yes.

25  Q   And you're aware then that First Place Bank

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 142

1      had sent you a notice indicating that your

2      employment would be terminated?

3  A   That is correct.

4  Q   All right.  So I had asked you previously

5      about -- I'll tell you what.  Let's take a

6      quick break.  I'll organize these documents,

7      make it a little quicker, and I'll get this

8      redacted.

9                      THE VIDEOGRAPHER:   Off the

10     record.  The time is 1:32.

11                      (Short break taken.)

12                      THE VIDEOGRAPHER:   Back on the

13     record.  The time is 1:39.

14  BY MR. WARE:

15  Q   Mr. Kausmeyer, you testified earlier about

16     documents you had produced in this case relating

17     to your expenses.  I had asked you about that.

18                      MS. KRAMER:        He didn't

19     talk about documents he produced related to the

20     expenses.

21                      MR. WARE:          Yes.  I asked

22     him.  He said he would have to see the actual

23     documents.

24                      MS. KRAMER:        Oh, okay.

25     All right.  I think there were a couple.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 143

1          MR. WARE:          What's that?

2          MS. KRAMER:          You're right.

3     I think there were a couple.  I think what he

4     testified to is that most of the documents are

5     in California or are in boxes somewhere.

6          MR. WARE:          Okay.

7  Q  Well, I'm just going based on your responses

8     and all the documents we got, but we're going

9     to go through them now.

10         So you produced to us a number of

11    documents that related to plane flights you had

12    taken in the year 2011.  Do you recall producing

13    those?

14 A  Yes.

15 Q  And it looks from the documents as if you had

16    found those on your e-mail system.  Is that

17    right?

18 A  That is correct.

19 Q  Okay.  And what was the purpose of finding

20    those documents?

21 A  Counsel had asked for those copies.

22              - - - - -

23         (Plaintiff's Exhibits Nos. 28A through

24    28N were marked.)

25              - - - - -

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 144

1    Q    So I'm going to hand you what's been marked as

2         Exhibit 28A through 28I.  Or, excuse me, 28N.

3         So it's sequentially 28A, B, C, D, all the way

4         through 28N.

5    A    Very good.

6                    MR. WARE:          There you go.

7    Q    And these are the documents from your

8         production that related to airline flights

9         that you apparently took between Florida and

10        Pennsylvania on your way to Ohio in 2011.

11   A    That is correct.

12   Q    And do you know whether you have submitted

13        these for expense reimbursement at any time

14        with First Place Bank?

15   A    I am certain most of these would have been

16        included with those that had receipts.  Since

17        they're easily produceable today, I would have

18        had them back then as well.

19   Q    But what you have in the boxes are hard copies

20        of what you submitted?

21   A    They are hard copies, yes.

22   Q    Including the copies of the receipts that you

23        submitted?

24   A    Yes, yes, yes.

25   Q    So you would have in these boxes, your

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 145

1      understanding is, would be hard copies of all

2      of these documents we've marked as Exhibit 28 --

3   A  That is correct.

4   Q  -- A through N, correct?

5   A  That is correct.

6   Q  All right.  Along with other documents, correct?

7   A  Correct.

8   Q  And you can't look through these and be able to

9      tell us one way or the other for sure whether

10     they were a part of that submission or not; is

11     that right?

12  A  I would not be able to do that at this time,

13     no.

14  Q  And do you know -- quite a number of these --

15     we don't need to look through them, but we can

16     if you want to, but quite a number of these are

17     simply confirmations of airline flights.

18     They're not actually receipts.  Was it, in

19     fact, the case that you paid for all of these

20     airline flights?

21  A  Yes.

22  Q  You did?  You paid for airline flights and then

23     sought reimbursement; is that right?

24  A  That would be correct, yes.

25  Q  And there's an e-mail here, the To is called

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 146

1          justshowmethemoney@gmail.com.  Is that your

2          e-mail?

3     A    That is another e-mail, yes.

4     Q    Another e-mail that you have?

5     A    Yes.

6     Q    And what do you use that e-mail for?

7                    MS. KRAMER:          Objection,

8          but you can answer.

9     A    Whatever was linked at the time, that's what

10         was used.

11    Q    I'm sorry?

12    A    Whatever was linked to that e-mail at the time,

13         that's what it's used for.  There wasn't any

14         thought into what e-mail would be utilized.

15    Q    Well, you had another e-mail which was --

16    A    gkausmeyer.

17    Q    -- gkausmeyer@gmail, correct?

18    A    Correct.

19    Q    I am just asking, did you have a -- did you

20         separate out the justshowmethemoney e-mail for

21         purposes of expense reimbursements or other

22         specific things?

23    A    These e-mails existed long before I was at

24         First Place, so there was no thought whatsoever

25         given to what went to what gmail.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 147

1  Q   But when you searched for documents for use in

2      this case, did you look for your documents

3      under both e-mail accounts?

4  A   Yes, I looked under both.

5              MS. KRAMER:        Based on your

6      questions, can I assume that Tom Shafer and Kim

7      Wadman have not found the expense report that

8      Gary submitted in April 2013?

9              MR. WARE:         There is an

10     expense report, but it has nothing to do with

11     any of this stuff.

12             MS. KRAMER:        So they do,

13     but they -- okay.  Why haven't they received it

14     then?

15             MR. WARE:         You have

16     received it.

17             MS. KRAMER:        You sent us

18     an expense report?  Was it in that pile that we

19     got last night?

20             MR. WARE:         Yes.

21     Yesterday afternoon.

22             MS. KRAMER:        Okay.

23                  - - - - -

24         (Plaintiff's Exhibits Nos. 29A through

25     29D were marked.)

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 148

```
 1                        - - - - -
 2    Q    All right.  So I'm going to show you exhibits
 3         that have been marked 29A, B, C and D, and
 4         these appear to be all of the documents you
 5         produced to us relating to car rentals that you
 6         made during your time at First Place Bank.  Is
 7         that right?
 8    A    Correct.
 9    Q    And is it your recollection, as with Exhibit 28,
10         those documents that -- you submitted these for
11         reimbursement in April of 2013?
12    A    There's a high likelihood that these were
13         included, yes.
14    Q    You don't know as you sit here, but you believe
15         they would have been?
16    A    I believe they would have been.  I can't tell
17         you for sure, for -- with 100 percent
18         certainty.  How's that?
19    Q    And, again, your understanding is these are in
20         a box that you have --
21    A    Yes.
22    Q    -- in California?
23    A    Yes.
24    Q    And, again, were any of these incurred by First
25         Place Bank?  Were they all incurred by you?
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 149

1    A    They're all incurred by me.

2                 - - - - -

3              (Plaintiff's Exhibits Nos. 30A and 30B

4         were marked.)

5                 - - - - -

6    Q    I'm going to show you what has been marked as

7         Exhibits 30A and 30B, and these appear to be

8         notices of a statement that you would have

9         received from an AirTran Airways Visa card that

10        you have or had at the time.  Do you see that?

11   A    Correct.

12   Q    And there's no indication of any charges on

13        these statements, there's only indication of

14        the total balance due.  Do you see that?

15   A    Yes.

16   Q    How, if at all, do these relate to your

17        expenses?

18   A    All of these charges would have been

19        reimbursable by the bank for the airline

20        flights that I took as I was transitioning.

21   Q    So did you only put your airline flights on the

22        AirTran Airways?

23   A    For those that were related to AirTran, yes.

24        AirTran was not the only airline that I flew.

25   Q    But you didn't make any other purchases on your

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 150

1       card other than airline flights for AirTran

2       Airways?

3    A  As I recall, that's the only thing I used it

4       for.

5    Q  You'd be able to pull these actual statements

6       if you needed to, correct?

7    A  That is correct.

8    Q  And also, these statements would be duplicative

9       of the charges that would be reflected on

10      Exhibit 28 which are the actual airline --

11   A  That is correct.

12   Q  -- confirmations, correct?

13   A  That is correct.  For AirTran, yes.

14   Q  As for the AirTran --

15   A  Yes.

16   Q  -- flights?

17          Okay.

18              - - - - -

19          (Plaintiff's Exhibit No. 31 was marked.)

20              - - - - -

21   Q  All right.  I'm going to show you what's been

22      marked as Exhibit 31, and this is a U-Haul

23      contract for various items from U-Haul; is that

24      right?

25   A  Yes.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 151

1  Q   And this is in connection with your relocation

2      to Ohio?

3  A   Yes.

4  Q   Is that right?

5  A   Yes.

6  Q   And I take it you incurred these expenses?

7  A   Yes.

8  Q   And is it your recollection these would have

9      been submitted in April of 2013?

10 A   Yes.

11 Q   And are these the only relocation --

12 A   No.

13 Q   -- items that you submitted?

14 A   No.

15 Q   What else would you have submitted --

16 A   The actual contract for the truck.

17 Q   But you I take it were not able to find a copy

18     of that?

19 A   Not in my e-mail, no.

20 Q   Not in your e-mail, but you think it would

21     be --

22 A   I have a hard copy.

23 Q   In the hard copy.  Okay.

24              - - - - -

25         (Plaintiff's Exhibits Nos. 32A through

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 152

1     32D were marked.)

2                    - - - - -

3  Q  All right.  I'm going to hand you what's been

4     marked as Exhibits 32A, B, C and D, and these

5     appear to be records of payments that you made

6     for electric in your Ohio apartment.  Is that

7     right?

8  A  Correct.

9  Q  And, again, you were able to collect these in

10    response to our request for documents --

11 A  Correct.

12 Q  -- right?

13           And, again, it's your belief that these

14    would have been submitted, but you wouldn't

15    know for sure unless you get the hard copies,

16    correct?

17 A  Correct.

18                    - - - - -

19         (Plaintiff's Exhibit No. 33 was marked.)

20                    - - - - -

21 Q  All right.  I'm going to show you Exhibit 33.

22    This reflects a payment that you made to change

23    your license plates to Ohio or obtain Ohio

24    plates.  Is that right?

25 A  Correct.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 153

 1    Q    Same set of questions.  Do you believe you
 2         submitted this?
 3    A    Correct.
 4    Q    And, again, if you did submit it, you'd have a
 5         hard copy in that box in California?
 6    A    Correct.
 7                        - - - - -
 8              (Plaintiff's Exhibit No. 34 was marked.)
 9                        - - - - -
10    Q    I show you Exhibit 34, and this appears to be a
11         bill for renewal of a membership in an
12         organization called ISACA.  Is that right?
13    A    Correct.
14    Q    And the bill indicates an amount due of $225.
15         Is this an amount that you believe was
16         submitted?
17    A    Yes.
18    Q    Do you have some indication that you paid it?
19    A    I did pay it, yes.
20    Q    Okay.  And my question is do you have some --
21    A    Yes.
22    Q    -- documentation of that.
23    A    I do.
24    Q    And where would that be?
25    A    In the box in California.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 154

1  Q  And it's your understanding that these

2     organizational payments were reimbursable to

3     you by the bank?

4  A  Yes.

5  Q  Did you ever receive reimbursement for those?

6  A  No.

7                    - - - - -

8          (Plaintiff's Exhibit No. 35 was marked.)

9                    - - - - -

10 Q  I'm handing you what's been marked Exhibit 35

11    and it's a copy of a check to Dietlew Properties

12    dated December 5, 2013.  What is this in

13    relation to?

14 A  This was the last rental -- prorated rent on

15    the apartment in Ohio.

16 Q  Last meaning this is right before you left in

17    Ohio?

18 A  Upon termination, I had to give 30 days' notice

19    to the apartment community to vacate, and this

20    represents the last prorated rent for that

21    period.

22 Q  All right.  And are you making some claim

23    relating to this amount?

24 A  I think it was just showing that I had to

25    retain this property through this time period.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 155

1  Q  But you had never -- you never made any

2     requests for reimbursement of this amount?

3  A  No.

4  Q  That's correct, right?

5  A  That is correct.

6                  - - - - -

7            (Plaintiff's Exhibit No. 36 was marked.)

8                  - - - - -

9  Q  I hand you Exhibit 36, and what is this

10    document?

11 A  This shows the last six months of rental

12    payments through the same Dietlew Properties,

13    otherwise Sawgrass Apartments.

14 Q  When you say "last six months," I only see

15    three entries here.

16 A  The payments made on June 4, 2013, August 2nd,

17    2013 and October 3rd of 2013 are each paying

18    two months of rent at the same time.

19 Q  And you never made any requests for

20    reimbursements of these amounts; is that

21    correct?

22 A  That is correct.

23 Q  And you would not have been entitled to

24    reimbursement under the bank's policy, correct?

25            MS. KRAMER:      Objection.

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 156

1      You can answer.

2   A   You know, the bank would have to answer that.

3   Q   Well, I mean just based on Exhibit Number 1

4      that we looked at which indicated the amounts

5      that you would be entitled to for six months,

6      correct?

7   A   For my initial move, yes, six months per the

8      offer letter.  This would not fall under the

9      offer letter.

10  Q   Would not fall under the offer letter.

11         Is there any other basis that you would

12      count your rent as expenses the bank is

13      responsible for?

14  A   I think we're just showing from the standpoint

15      that I was still carrying two apartments or two

16      housing payments through this period of time.

17  Q   My question is is there some basis that you

18      know of that you believe you would be entitled

19      to reimbursement of these amounts.

20  A   I believe I would not have had to carry the

21      apartment for this period of time if we had

22      clarity much earlier in the process in regards

23      to my employment status with the bank, so I

24      incurred these expenses through this period.

25      Having -- obviously, this would not -- I did

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 157

1      not submit this for reimbursement.

2                    - - - - -

3              (Plaintiff's Exhibit No. 37 was marked.)

4                    - - - - -

5   Q   All right.  I show you what's been marked as

6       Exhibit 37.  This is a document that you

7       produced to us.  It appears to be an e-mail

8       from Fred Sarazin to himself dated March 1 of

9       2011, and then there's an attachment, although

10      not all the attachments that are reflected in

11      the e-mail.

12              Do you know what this document is?

13  A   I was told by Mr. Wolfe this was my

14      predecessor's document.

15  Q   You were told by Mr. Wolfe this is your

16      predecessor's document at what time?

17  A   At probably -- this is dated April 3rd, 2012,

18      so it was probably right around that time.

19  Q   Is there some reason that you recall Mr. Wolfe

20      giving this to you?

21  A   I believe it was in response to ongoing

22      investigations of certain executive officers

23      at the bank.

24  Q   What did he say to you when he gave it to you?

25  A   That this was a document that my predecessor

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 158

```
 1      produced of the known issues that he was aware

 2      of at the time of his employment.

 3   Q  So this was just for your informational

 4      purposes?

 5   A  I believe it was, yes.

 6   Q  Are these things that you were supposed to act

 7      on?

 8   A  I do believe some were.  I think some stuff is

 9      known.  I think some stuff is confidential.

10   Q  Is there some reason you kept this document

11      after you left the company?

12   A  The -- this was I believe boxed up after my

13      departure from Ohio and uncovered later on.

14   Q  I'm sorry.  I didn't follow that.  You boxed it

15      up?

16   A  So in December of 2013, this was included in

17      boxes made with the move out of Ohio.

18   Q  So this is just something you found -- you

19      happened to find when you unpacked your boxes

20      in Florida?

21   A  This was uncovered.  I don't recall where or

22      when, but, yes, it was uncovered.

23   Q  And how do you maintain this document today?

24   A  It's in hard copy.

25   Q  Is it in a particular file?
```

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 159

1   A   I'm sorry?

2   Q   Is it in a file with other documents?

3   A   I honestly -- you know, since I uncovered it, I

4       don't think I did anything specific with it

5       other than keep it in some sort of a manila

6       folder.

7   Q   And do you know why this document as opposed to

8       other documents relating to First Place Bank,

9       you would have retained those?

10  A   This was part I believe of a deposition I had

11      to do in conjunction with some ongoing

12      investigations with the bank, so I don't want

13      to speak specifically to those ongoing

14      investigations, but I do know this was part of

15      it, and that deposition did occur in Florida.

16  Q   Okay.  I thought I had asked you at the outset

17      if you had ever had your deposition taken and

18      you said no.

19  A   I don't know if that was a formal deposition if

20      it was SIGTARP.

21  Q   I'm sorry?

22  A   It was SIGTARP, so I don't know that it was --

23      there was any lawyers present.  It was just an

24      investigator.  So I don't know if that's

25      considered a deposition.  I don't believe it

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 160

1      was, but I did have to give statements to this

2      investigator.

3  Q   Oh, okay.  And when did you do that?

4  A   In Florida in 2012.

5  Q   So this was while you were employed at First

6      Place Bank?

7  A   Yes, and counsel was made aware of that at the

8      time.  Craig Carlos was made aware of it.  And

9      I believe that's how Mr. Wolfe may have come

10     across this document.

11 Q   And my question though was why you would have

12     retained this as opposed to any other First

13     Place Bank business records.

14                 MS. KRAMER:          Objection.

15     He's asked and answered that already.

16                 THE WITNESS:         Yeah.

17                 MS. KRAMER:          Let's move

18     on.

19                 MR. WARE:            No, he hasn't

20     answered it yet.

21 A   When I go through the rest of the boxes, I will

22     see what else is there, but this is all I have

23     uncovered so far.  I have not made a -- or have

24     not had an opportunity to make a concerted

25     effort to go through the numerous boxes that

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 161

1    have been moved.

2  Q  So this was in the boxes in California?

3  A  No.  This was in a box that I believe I

4     uncovered at some point prior to California

5     because that move was recently and this was

6     produced well before that.  This is probably

7     somewhere between the move in Ohio and the move

8     to California.

9  Q  So what else was in the box that contained this

10    document?

11 A  Personal effects.

12 Q  And, again, I'm trying to understand why it is

13    you would have this document as opposed to

14    other documents.

15                MS. KRAMER:        Objection.

16    He's asked and answered that now a couple of

17    times.

18                MR. WARE:        Well, he's

19    telling me where he found it.

20 A  I don't know what I --

21 Q  I'm just wondering why you would have kept it.

22 A  I don't know that it was intentional, but all I

23    know is that I have it.

24 Q  And you maintained this at your home and not in

25    your office at First Place Bank?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 162

1    A    This made it from the office to my home, yes.

2    Q    And why would you have taken it home?

3                   MS. KRAMER:          Objection.

4         You can answer.

5    A    I can't remember if it specifically related to

6         that conversation with the investigator in

7         Florida or not, but it was right around that

8         time that this would have been utilized for

9         that discussion, and then it would have

10        traveled with me, you know, back to Ohio,

11        and then somehow made it from Ohio out in a

12        co-mingled disorganized moving box, so there

13        was no intent on my part to specifically

14        segregate this one out.

15                   - - - - -

16        (Plaintiff's Exhibit No. 38 was marked.)

17                   - - - - -

18   Q    I show you Exhibit 38 which looks like a

19        similar document.

20                   MS. KRAMER:          Thanks.

21   Q    And this is another e-mail from Mr. Sarazin to

22        himself which has one attachment relating to a

23        meeting apparently that he had.  And, again,

24        this is a document that you would have located

25        in your box in Florida?

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 163

 1   A   To me, it appears that these documents would

 2       have been together.

 3   Q   These meaning Exhibits 37 and 38?

 4   A   Yes, would probably be together.

 5   Q   So in terms of -- the questions in terms of

 6       retaining this document and where you found it

 7       and where you keep it would be exactly the

 8       same --

 9   A   Exactly the same.

10   Q   -- as Exhibit 37?

11   A   That's correct.

12   Q   Have you done anything with these documents

13       since you left First Place Bank other than

14       produce them to us?

15   A   No.

16   Q   With respect to the boxes that you have in

17       California, is it your understanding that there

18       would be other documents relating to First

19       Place Bank's business or your employment at

20       First Place Bank beyond just the expense

21       reimbursement forms you've already testified

22       to?

23   A   I don't know, but if they're there, it would

24       not be intentional.

25   Q   Would not be intentional in the sense of you

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 164

```
 1      didn't intentionally take them?

 2  A   Correct.  I wasn't afforded an opportunity in

 3      July to, you know, go through anything.  It was

 4      just pick up and go.

 5  Q   In July meaning when you were walked out?

 6  A   When I was walked out, correct.

 7  Q   Did you ever return documents that you had

 8      retained at your home or anywhere else outside

 9      of the bank --

10  A   As --

11  Q   -- to the bank after you left?

12  A   No, not as of this date.

13              MR. WARE:           Okay.  Why

14      don't we take a break?

15              THE VIDEOGRAPHER:   Off the

16      record.  The time is 2:05.

17              (Short break taken.)

18              THE VIDEOGRAPHER:   Back on the

19      record.  The time is 2:13.

20              MR. WARE:           Mr. Kausmeyer,

21      those are all the questions I have for you at

22      this time.  Thanks.

23              THE WITNESS:        Thank you.

24              MS. KRAMER:         Gary, you

25      have an opportunity to review the transcript
```

Deposition of Gary Kausmeyer , taken January 20, 2016

1     that the court reporter has taken today before

2     it's transcribed.  I would recommend that you

3     review it.  You also can waive your signature.

4     I would recommend that you review it.

5               THE WITNESS:       I will.

6               MS. KRAMER:       Okay.  So no

7     waiver.

8               THE VIDEOGRAPHER:  Off the

9     record.  The time is 2:13.

10             - - - - -

11       (The videotaped deposition concluded at

12     2:13 p.m.)

13             - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Gary Kausmeyer , taken January 20, 2016

166

THE STATE OF OHIO,     )     SS:
COUNTY OF CUYAHOGA.     )

     I, Elaine S. Newlin, a Notary Public within
and for the State of Ohio, duly commissioned and
qualified, do hereby certify that GARY KAUSMEYER
was first duly sworn to testify the truth, the
whole truth and nothing but the truth in the cause
aforesaid; that the testimony then given by him
was by me reduced to stenotypy in the presence of
said witness, afterwards transcribed on a computer/
printer, and that the foregoing is a true and
correct transcript of the testimony so given by
him as aforesaid.

     I do further certify that this videotaped
deposition was taken at the time and place in the
foregoing caption specified.  I do further certify
that I am not a relative, counsel or attorney of
either party, or otherwise interested in the event
of this action.

     IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Cleveland,
Ohio, on this 3rd day of February, 2016.

               Elaine S. Newlin, Notary Public
               Within and for the State of Ohio.
               My Commission expires August 22, 2020

Deposition of Gary Kausmeyer , taken January 20, 2016

Page 167

167

THE STATE OF                    _)
                           )   SS:
COUNTY OF _ _ _ _ _ _ _ _ _ _ _)

     Before me, a Notary Public in and for said

state and county, personally appeared the above-

named GARY KAUSMEYER, who acknowledged that he did

sign the foregoing transcript and that the same is a

true and correct transcript of the testimony so

given.

     IN TESTIMONY WHEREOF, I have hereunto affixed

my name and official seal at

this        day of                , 2016.


                         Gary Kausmeyer



                         Notary Public

My Commission Expires:     _

en

Deposition of Gary Kausmeyer , taken January 20, 2016

168

DEPOSITION ERRATA SHEET

Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:

SIGNATURE:                              DATE:
                Gary Kausmeyer